UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ x

C. ROBERT ALLEN, III, by LUKE ALLEN, as Guardian for   :
the Property Management of C. Robert Allen, III,
                                                       :   09-CV-0668

                    Plaintiff,                         :   (ADS) (MLO)

                                                       :

                 - against -                           :   **AMENDED**
                                                       :   **COMPLAINT**

CHRISTOPHER DEVINE, BRUCE BUZIL, LAKESHORE             :
MEDIA, LLC, MILLCREEK BROADCASTING LLC,
COLLEGE CREEK MEDIA LLC, MARATHON MEDIA                :
GROUP, LLC, 3 POINT MEDIA – SALT LAKE CITY, LLC,       :   **JURY TRIAL**
3 POINT MEDIA DELTA, LLC, 3 POINT MEDIA – UTAH,        :   **DEMANDED**
LLC, 3 POINT MEDIA – FRANKLIN, LLC, 3 POINT
MEDIA – PRESCOTT VALLEY, LLC, 3 POINT MEDIA –          :
COALVILLE, LLC, 3 POINT MEDIA - ARIZONA, LLC, 3        :
POINT MEDIA - FLORIDA, LLC, 3 POINT MEDIA -            :
KANSAS, LLC, 3 POINT MEDIA - OGDEN, LLC, 3 POINT       :
MEDIA - SAN FRANCISCO, LLC, MIDVALLEY RADIO
PARTNERS, LLC, D&B TOWERS LLC, SUPERIOR                :
BROADCASTING OF NEVADA, LLC, SUPERIOR                  :
BROADCASTING OF DENVER, LLC, WACKENBURG                :
ASSOCIATES, LLC, PORTLAND BROADCASTING LLC,            :
DESERT SKY MEDIA LLC, SKY MEDIA LLC, DEVINE            :
RACING MANAGEMENT, LLC, ACB CONSULTING CO.,            :
RICHARD DAVIS, EXCELSIOR CAPITAL, LLC,                 :
SUPERIOR BROADCASTING CO., and John Does 1-50,         :

                    Defendants.                        :

------------------------------------------------------------------------ x

C. Robert Allen, III ("Allen" or "Plaintiff"), by and through Luke Allen, the Guardian for

the Property Management of Allen (the "Guardian" or "Luke"), and his counsel, Cohen &

Gresser LLP, as and for his amended complaint, alleges as follows:

## NATURE OF THE ACTION

1.      This case arises from a scheme by Christopher Devine ("Devine"), Bruce Buzil

("Buzil"), and a network of companies controlled by them, to wrest millions of dollars from

Allen through a pattern of fraud and deceit.  Together with their network of companies, Buzil and Devine carried out a pattern of racketeering activity which to date has successfully defrauded Allen of nearly seventy million dollars.

2.      Allen is a mentally and physically frail individual in his late seventies who is under a judicially-imposed financial guardianship.  Prior to meeting Devine and Buzil, Allen had inherited millions of dollars but had never had the business success gained by his father and certain other members of his family.  Due to his frailty, Allen lives a relatively isolated life and consequently greatly values personal visits.

3.      Allen met Devine and Buzil in the 1980's in connection with a business in which Allen had invested.  Devine and Buzil ingratiated themselves with Allen, making it seem that they were personal friends of Allen by calling him on the telephone, visiting his home, and performing personal favors for Allen.

4.      Starting in or about 2000, Devine and Buzil induced Allen to make a series of loans to Superior Broadcasting Co. ("Superior") based on knowingly false representations and material omissions.

5.      At its core, the fraud is a simple one:  for years, Devine and Buzil persuaded Allen to wire money to Superior, a company that they repeatedly falsely described both orally and by means of false financial statements and other documents as owning multiple radio stations, pursuing an active radio station business including further radio station acquisitions and development of existing stations, and having ongoing financial needs stemming from its purported radio operations.

6.      In fact, Superior did not own, and never purchased, a single radio station.  It was merely a shell company, through which Devine and Buzil filtered money to other entities within

2

a web of limited liability companies created and controlled by them (the "Devine/Buzil LLCs"). Those entities in fact owned and developed radio stations, using the money Allen had contributed to Superior. Superior, meanwhile, received nothing in return.

7.      Virtually as soon as Allen's money was deposited to Superior, Devine, who was Superior's President, would transfer the money to another of the many LLCs that he and Buzil controlled. The Devine/Buzil LLCs – in which Allen owned no interest – would use Allen's money for purposes including to purchase a radio station, develop existing station assets, fund operating capital, subsidize technical development, or provide management and other services related thereto, with no benefit to Allen. Devine and Buzil also transferred Allen's money to companies that operated marathons and other long-distance road races. Devine and Buzil did not track the uses to which Allen's monies were put. Nor did Devine and Buzil make any effort to maintain any reserve in any company – including Superior – for the purpose of repaying Allen.

8.      Devine and Buzil then caused the Devine/Buzil LLCs to take on debt from other lenders, using the radio stations purchased with Allen's money as collateral. By doing so, Devine and Buzil ensured that Allen's monies not only would be diverted from Superior, the entity for which they were intended, but would immediately be encumbered by even more debt and interests in the collateral purchased with Allen's funds.

9.      Buzil and Devine's false representations were conveyed by the wires over a period of years during which Allen was deceived by false statements concerning the use and whereabouts of his money and the nature of Superior's operations. In addition, the fraud was furthered by numerous wires made by Allen from his accounts in New York to Superior's accounts in Illinois. Once wired, these funds were promptly diverted by Buzil and Devine. The fraud was also furthered by numerous documents sent through the mails and interstate carriers.

10.     Among other fraudulent acts by which Buzil and Devine convinced Allen to loan money to Superior, Buzil and Devine faxed fraudulent financial statements to him that falsely painted a picture of Superior as a profitable entity.  Though the financial statements were intended to create the impression that Allen had invested in a legitimate and profitable enterprise that generated actual credits and debits to its balance sheet through its business dealings, in fact, Superior did not own any radio stations, had no other assets, and had no active business operations at all.

11.     Throughout this period, Devine would speak to Allen by telephone multiple times each day, including weekends and holidays.  Devine's undue influence over Allen allowed Devine to count on getting millions of dollars from Allen on short notice based solely on Devine's word about why the funds were supposedly urgently needed for some deal or purported operational need related to Superior's supposed business operations.  In reality, however, Devine would use these funds to support his own separate personal business, or simply to enrich himself and Buzil.

12.     Among other things, Buzil and Devine used Allen's money to pay themselves generous salaries and bonuses, often through engineering and consulting fees paid to businesses controlled by them; to fund other businesses from which neither Superior nor Allen received a benefit; and to pay exorbitantly high rates of interest and repayment of principal on loans made to them personally and to their separate entities.

13.     In late 2005 and 2006, Allen's family and attorney began investigating his dealings with Devine and Buzil.  Although they repeatedly asked for information documenting Allen's investments, Superior's assets, and other key financial documents, Devine and Buzil effectively stonewalled Allen's advisors for years.  Frequently, Devine would telephone Allen

4

and convince Allen to countermand Allen's own requests that information concerning Allen's financial affairs be provided to members of his family, so as to prevent them from discovering the true extent of the fraud.

14.     Despite the involvement of Allen's lawyer and family, Devine continued to contact Allen directly.  Because he had developed such a close relationship with Allen, Devine was able to convince Allen to continue to wire money to Superior even as his advisors were beginning to unravel the fraudulent scheme.

15.     Ultimately, Allen was placed under a judicial guardianship, pursuant to which Luke Allen has authority to bring this action.

16.     Through their conduct, as detailed below, Devine and Buzil conducted or participated, directly or indirectly, in the affairs of an enterprise through a pattern of racketeering activity and conspired to do so, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*

17.     Through their conduct, Defendants also committed common law fraud and conversion, and were unjustly enriched.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this case under 28 U.S.C. § 1331 because it arises under the federal RICO statute, 18 U.S.C. § 1961 *et seq.*

19.     This Court has expressly found that it has personal jurisdiction over Buzil and D&B Towers, LLC.

20.     In addition, this court has jurisdiction because this case is brought by a resident of New York against Devine and Buzil, both of whom are residents of Illinois.  The Devine/Buzil LLCs are either Illinois or Delaware LLCs, and upon information and belief, no member of any

of these LLCs is a resident of New York.  Upon information and belief, no member of Devine

Racing Management, LLC, an Illinois LLC, is a resident of New York.  ACB Consulting Co. is

an Illinois corporation with its principal place of business in Illinois.

21.     This Court has personal jurisdiction over each of the Defendants under CPLR §

302 because each of them committed a tort in New York.  In addition, each Defendant engaged

in commercial transactions taking place at least in part in New York, and each Defendant's

conduct in those transactions is the subject of this action.  Finally, to the extent that any of the

Defendants' tortious acts were committed outside of New York, each Defendant knew that his

acts would have consequences in New York and each Defendant derives substantial revenue

from interstate commerce.

22.     This Court has personal jurisdiction over Richard Davis and Excelsior Capital,

LLC because said Defendants are New York residents.

23.     Venue is appropriate in this District under 28 U.S.C. § 1391 because a substantial

part of the events and omissions giving rise to the claims occurred here.  This Court has found

that the Eastern District of New York is the appropriate venue for this action.

## PARTIES

24.     At all relevant times, Devine lived and worked in Chicago, Illinois and also

maintained a home in Salt Lake City, Utah.

25.     At all relevant times, Buzil lived and worked in Chicago, Illinois.

26.     On information and belief, for over twenty years Devine and Buzil have partnered

in various business ventures, including various entities through which they have purchased and

sold hundreds of radio stations.  These entities include the Devine/Buzil LLCs.

27.     The Devine/Buzil LLCs are: Lakeshore Media, LLC, Millcreek Broadcasting,

LLC, College Creek Media, LLC, Marathon Media Group, LLC, 3 Point Media – Salt Lake City, LLC, 3 Point Media Delta, LLC, 3 Point Media – Utah, LLC, 3 Point Media – Franklin, LLC, 3 Point Media – Prescott Valley, LLC, 3 Point Media – Coalville LLC, 3 Point Media - Arizona, LLC, 3 Point Media - Florida, LLC, 3 Point Media - Kansas, LLC, 3 Point Media - Ogden, LLC, 3 Point Media - San Francisco, LLC, MidValley Radio Partners, LLC, D&B Towers LLC, Superior Broadcasting Of Nevada, LLC, Superior Broadcasting Of Denver, LLC, Wackenburg Associates, LLC, Portland Broadcasting LLC, Desert Sky Media LLC, and Sky Media LLC.  As detailed herein, Devine and Buzil control each of the Devine/Buzil LLCs through a majority equity interest and by managing their operations directly.  During the time period relevant to this action, the Devine/Buzil LLCs were all run out of Devine and Buzil's office at 980 N. Michigan Ave, Suite 180, Chicago, Illinois.

28.    Lakeshore Media, LLC is an Illinois LLC and may be served at CT Corporation System, 208 S. LaSalle St., Suite 814, Chicago, IL 60604.  Upon information and belief, no member of Lakeshore Media is a resident of New York.

29.    Millcreek Broadcasting, LLC is an Illinois LLC with a principal place of business at 2835 E. 3300 S., Salt Lake City, UT 84109.  Upon information and belief, prior to 2007, Millcreek Broadcasting's principal place of business was at 980 N. Michigan Ave., Suite 1880, Chicago, IL 60611.  It may be served at CT Corporation System, 208 S. LaSalle St., Suite 814, Chicago, IL 60604.  Upon information and belief, no member of Millcreek Broadcasting is a resident of New York.

30.    College Creek Media, LLC is an Illinois LLC and may be served at CT Corporation System, 208 S. LaSalle St., Suite 814, Chicago, IL 60604.  Upon information and belief, no member of College Creek Media is a resident of New York.

7

31.     Marathon Media Group, LLC is a Delaware LLC and may be served at Corporation Trust Company, Corporation Trust Ctr., 1209 Orange St., Wilmington, DE 19801 or at CT Corporation System, 208 LaSalle St., Suite 814, Chicago, IL 60604.  Upon information and belief, no member of Marathon Media Group is a resident of New York.

32.     3 Point Media – Salt Lake City, LLC is an Illinois LLC and may be served at CT Corporation System, 208 S. LaSalle St., Suite 814, Chicago, IL 60604.  Upon information and belief, no member of 3 Point Media – Salt Lake City is a resident of New York.

33.     3 Point Media – Delta, LLC is an Illinois LLC with a principal place of business at 2835 E. 3300 S., Salt Lake City, UT 84109.  Upon information and belief, prior to 2007, 3 Point Media-Delta's principal place was at 980 N. Michigan Ave., Suite 1880, Chicago, IL 60611.  It may be served care of Robert E. Neiman, 77 West Wacker Dr., Suite 2500, Chicago, IL 60901.  Upon information and belief, no member of 3 Point Media – Delta is a resident of New York.

34.     3 Point Media – Utah, LLC is an Illinois LLC and may be served care of Robert E. Neiman, 77 W. Wacker Dr., Suite 2500, Chicago, IL 60601.  Upon information and belief, no member of 3 Point Media – Utah is a resident of New York.

35.     3 Point Media – Franklin, LLC is an Illinois LLC and may be served at CT Corporation System, 208 S. LaSalle St., Suite 814, Chicago, IL 60604.  Upon information and belief, no member of 3 Point Media – Franklin is a resident of New York.

36.     3 Point Media – Prescott Valley, LLC is an Illinois LLC and may be served care of Robert E. Neiman, 77 W. Wacker Dr., Suite 2500, Chicago, IL 60601.  Upon information and belief, no member of 3 Point Media – Prescott Valley is a resident of New York.

37.     3 Point Media – Coalville, LLC is an Illinois LLC and be served care of Robert E.

8

Neiman, 77 W. Wacker Dr., Suite 2500, Chicago, IL 60601. Upon information and belief, no member of 3 Point Media – Coalville is a resident of New York.

38.     3 Point Media – Arizona, LLC is an Illinois LLC and may be served at CT Corporation System, 208 S. LaSalle St., Suite 814, Chicago, IL 60604. Upon information and belief, no member of 3 Point Media – Arizona is a resident of New York.

39.     3 Point Media – Florida, LLC is an Illinois LLC and may be served care of Robert E. Neiman, 77 W. Wacker Dr., Suite 2500, Chicago, IL 60603. Upon information and belief, no member of 3 Point Media – Florida is a resident of New York.

40.     3 Point Media – Kansas, LLC is an Illinois LLC that may be served at CT Corporation System, 208 S. LaSalle St., Suite 814, Chicago, IL 60604. Upon information and belief, no member of 3 Point Media – Kansas is a resident of New York.

41.     3 Point Media – Ogden, LLC is an Illinois LLC that may be served care of Robert E. Neiman, 77 W. Wacker Dr., Suite 2400, Chicago, IL 60602. Upon information and belief, no member of 3 Point Media – Ogden is a resident of New York.

42.     3 Point Media – San Francisco, LLC is an Illinois LLC that may be served at LexisNexis Document Solutions, 801 Adlai Stevenson Dr., Springfield, IL 62703. Upon information and belief, no member of 3 Point Media – San Francisco is a resident of New York.

43.     MidValley Radio Partners, LLC is an Illinois LLC that may be served at CT Corporation System, 208 S. LaSalle St., Suite 814, Chicago, IL 60604. Upon information and belief, no member of MidValley Radio Partners is a resident of New York.

44.     D&B Towers, LLC is an Illinois LLC that may be served at LexisNexis Document Solutions, 801 Adlai Stevenson Dr., Springfield, IL 62703. Upon information and belief, no member of D&B Towers is a resident of New York.

45. Superior Broadcasting of Nevada, LLC is an Illinois LLC that may be served at LexisNexis Document Solutions, 801 Adlai Stevenson Drive, Springfield, IL 62703. Upon information and belief, no member of Superior Broadcasting of Nevada is a resident of New York.

46. Superior Broadcasting of Denver, LLC is an Illinois LLC that may be served at CT Corporation System, 208 S. LaSalle St., Suite 814, Chicago, IL 60604. Upon information and belief, no member of Superior Broadcasting of Denver is a resident of New York.

47. Wackenburg Associates, LLC is an Illinois LLC that may be served at CT Corporation System, 208 S. LaSalle St., Suite 814, Chicago, IL 60604. Upon information and belief, no member of Wackenburg Associates is a resident of New York.

48. Portland Broadcasting, LLC is a Delaware LLC that may be served at Lexis Document Services Inc., 2711 Centerville Rd. Suite 400, Wilmington, DE 19808 and at CT Corporation System, 208 S. LaSalle St., Suite 814, Chicago, IL 60604. Upon information and belief, no member of Portland Broadcasting is a resident of New York.

49. Desert Sky Media, LLC is a Delaware LLC that may be served at The Corporation Trust Company, Corporation Trust Ctr., 1209 Orange St., Wilmington, DE 19801 and at CT Corporation System, 208 S. LaSalle St., Suite 814, Chicago, IL 60604. Upon information and belief, no member of Desert Sky Media is a resident of New York.

50. Sky Media, L.L.C. is a Delaware LLC that may be served at Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808 and at CT Corporation System, Suite 814, Chicago, IL 60604. Upon information and belief, no member of Sky Media is a resident of New York.

51. Devine Racing Management, LLC ("Devine Racing") is an Illinois LLC that may

be served at 980 N. Michigan Ave., Chicago, IL 60611. Upon information and belief, no member of Devine Racing is a New York resident.

52.     ACB Consulting Co. ("ACB Consulting") is an Illinois Corporation that may be served at 980 N. Michigan Ave., Chicago, IL 60611.  Upon information and belief, Devine is the President of ACB Consulting.

53.     Richard Davis is a New York resident who may be served at 43 Cedar Lane, Sands Point, NY 11050.

54.     Excelsior Capital, LLC is a New York LLC that may be served at 43 Cedar Lane, Sands Point, NY 11050.  Upon information and belief, Richard Davis is the sole member and manager of Excelsior Capital, LLC.

55.     Superior Broadcasting Co. is a Delaware corporation that may be served C/O Nellabob Corporation, 711 Fifth Avenue, 5th Floor, New York, NY 10022.  During the time period relevant to this action, Superior was under the control of Devine and Buzil, who were its sole officers and directors.

56.     The John Doe defendants are additional entities or persons to which Devine and Buzil may have diverted Allen's funds and from whom Allen is entitled to recover those funds.

57.     At all relevant times, Allen lived in Port Washington, New York (where he continues to live).

58.     At all relevant times, the Guardian lived in Oxford, Pennsylvania.

## FACTS

### *Allen's Medical Condition and the Appointment of the Guardian*

59.     Allen was born on May 11, 1930.

60.     Allen inherited significant wealth.  He has always been interested in the radio

11

business and believed that owning and operating a network of radio stations would give him the opportunity to be as successful in the business world as others in his family have been.

61.     Allen's health began deteriorating in the 1980s.  He has osteoporosis and scoliosis.  As a result, he has suffered several vertebral fractures, radically limiting his mobility, and curving his spine.  In addition, Allen's hands are curved: he has difficulty straightening his fingers and thumbs, particularly his ring and pinky fingers.

62.     Allen's physical limitations made it hard for him to leave his home and isolated him to a great degree from the outside world.

63.     Allen was and is especially appreciative and trusting of persons who visit him at his home and places great value on their attention and companionship.

64.     Allen also has suffered significant memory and hearing loss over the years. Beginning in 2000, he also began losing his mental stamina.

65.     During the time that the relevant misconduct at issue occurred, Allen's mental and physical isolation and debilitation made him vulnerable to the exercise of undue influence by those in whom he reposed his trust, including Buzil and Devine.

66.     In February 2007, Allen's wife Grace commenced a proceeding in the Supreme Court of the State of New York, Nassau County, requesting the appointment of a guardian to manage Allen's property, based on concerns about his mental and physical state.

67.     In March 2008, Justice Joel K. Asarch of that Court issued an order appointing Luke Allen as the Guardian for the Property Management of Allen.  Pursuant to that order, the Guardian has the right to initiate this lawsuit on Allen's behalf.

### Devine's Efforts to Ingratiate Himself with Allen

68.     Allen first met Devine in the 1980s, when Allen invested in a company for which

12

Devine served as an executive.

69.     Devine aggressively pursued a business relationship and friendship with Allen. Shortly after meeting Allen, Devine began speaking with him by telephone every day.

70.     Devine and Allen's phone conversations continued every day (including weekends) for over twenty years. They usually spoke at least four times a day, and often spoke more frequently than that. Devine also visited Allen at his home in New York on multiple occasions. During the period of 2000-2006, Devine met with Allen at his home several times each year.

71.     During these conversations, Devine sought to induce Allen to invest in various business ventures Devine wanted to pursue. Devine portrayed himself as an experienced and successful entrepreneur, someone who could make money in whatever venture he touched.

72.     Devine also ingratiated himself into Allen's personal life. Allen was flattered at the interest Devine showed him. Devine professed agreement with Allen's point of view on many political and social issues, and Allen thought of Devine as a friend. Devine cultivated Allen's trust in him to the point where Allen believed that Devine would never act against his interests and would never lie to him.

73.     Through his myriad conversations with Allen, Devine learned that Allen had inherited and earned a considerable amount of money through the success of a family business founded by Allen's father and uncle, and wanted to achieve financial success in his own right. Devine preyed on Allen's desire to prove to his family that Allen, too, could be a very successful businessman.

74.     Although Devine appeared to take a personal interest in Allen and appeared to have Allen's interests at heart, the reality was that Devine saw Allen as a mark, someone he

13

could talk into giving him money based solely on his unverified information and personal charm.

### Devine and Buzil Orchestrate the Superior Broadcasting Fraud and Begin Diverting Money from Allen from 2000 On

75.     In or about 1999, Devine and Buzil began soliciting money from Allen for a company called Superior Broadcasting Company Co. ("Superior"). Devine was President of Superior and Buzil was its Secretary. They were also the only members of Superior's Board.

76.     Devine and Buzil described Superior's business plan as pursuing radio station "move-in" projects. A "move-in" involves the purchase of radio stations in areas close to large metropolitan areas that do not have the necessary power and other technical requirements necessary to serve the nearby metropolitan area. After the purchase, the radio stations can be upgraded technically so that they can serve all or a significant part of the nearby city. This process can sometimes involve the purchase of several stations in nearby frequencies.

77.     As described by Devine and Buzil to Allen, after all the technical upgrades are complete and any required FCC approvals obtained, the radio station would be "moved-in," that is, it could begin providing programming to the residents of the city. In theory, the radio station would then generate significantly more cash, because it could reach a much larger audience and charge more for advertising. Devine and Buzil knew that Allen hoped to own a large network of radio stations and they told him Superior could create that network through move-in projects.

78.     After a move-in, the radio station's greater future cash flow and its new and improved technology could also make it attractive to prospective purchasers who would, in theory, pay a premium above the initial purchase price and the costs of making the technical and other upgrades necessary. Although Allen was primarily interested in having Superior own and operate the radio stations, Devine and Buzil represented that Superior's assets could also be sold

14

to generate profits to be distributed to shareholders as well as to fund possible future investments.

79.   In the late 90's, Devine and Buzil had funded certain move-in projects for business entities owned by them with funds from other lenders.  In 2000, however, Devine began soliciting loans for Superior from Allen on a major scale.

80.   Allen had a majority shareholder interest in Superior as a carried equity interest from prior investments he had made with Devine.  According to Devine, Allen owned or controlled approximately 90% of the equity of Superior.

81.   In practice, however, Devine and Buzil controlled the company, including control of its financial accounts and records.  In particular, Devine and Buzil controlled the information Allen received (or did not receive) regarding Superior.

82.   Devine induced Allen to make these loans by affirmatively – and falsely – representing that the money would be used to purchase radio stations that would be owned by Superior.  Devine told Allen that Superior would purchase radio stations near large and mid-market urban areas with the goal of moving them into the urban areas.  Devine convinced Allen that Superior, upon completion of its move-in projects, would in fact own and operate stations in major markets such as New York City, Chicago, Las Vegas, Salt Lake City, Phoenix, and Denver.

83.   Devine was aware of Allen's long-time interest in the radio business, as well as his belief that he could have business success by owning a network of radio stations.  Devine affirmatively played on Allen's interest in becoming a radio mogul by falsely telling him that Superior would own a large number of radio stations and that these properties would provide Allen with significant profits.  Devine, however, knew to a certainty that he had no intention of

15

carrying out these plans.

84.    Over the years, Devine falsely represented to Allen that Superior had taken acts in furtherance of the initial business plan, including purchasing and developing radio stations. These misrepresentations include memoranda describing stations Superior owned and plans it had to acquire additional stations.  Devine solicited more and more money for Allen, supposedly to fund Superior's business operations.

85.    Buzil was aware of these representations and assisted Devine in operating the business Allen funded based on Devine's representations.  Despite knowing that Allen was lending money in reliance on Devine's false statements, and knowing that the statements were false when made and on a continuing basis, Buzil never corrected Allen's often-stated understanding that Allen's money was being used to purchase and develop radio stations for Superior and to fund Superior's ongoing radio-station business.  Buzil also directed the movement of funds from Superior to businesses in which he and Devine held ownership interests.

86.    Relying on the representations of Devine and Buzil's plan for Superior, Allen first wired money to Superior in April 2000.  Allen's wires were originally for comparatively small amounts: $400,000 on April 24, 2000 and $175,000 on December 18, 2000.

87.    After those first loans, Devine and Buzil now began to induce further wires based on a false picture of what Superior actually owned and was doing in its business operations.

88.    Devine and Buzil continued to misrepresent and not to disclose the truth concerning Superior.  They told Allen that Superior was an active radio-station business and that it needed more money.  In fact, Superior was not carrying on operations at all, and had never purchased a single radio station.

16

89.    In 2002, in reliance on Devine and Buzil's continued false descriptions of Superior's operations and financial condition, Allen loaned Superior an additional $9,605,000, a significant increase from his prior loans.  In 2003, Allen loaned Superior a further $8,880,000; in 2004 he loaned the company $7,475,000.

90.    The following table lists the wires Allen made to Superior during 2002-2004.

| Date | Amount |
|---|---|
| February 7, 2002 | $160,000.00 |
| March 7, 2002 | $300,000.00 |
| March 21, 2002 | $300,000.00 |
| April 10, 2002 | $1,000,000.00 |
| June 3, 2002 | $800,000.00 |
| June 14, 2002 | $1,125,000.00 |
| July 12, 2002 | $800,000.00 |
| July 31, 2002 | $1,900,000.00 |
| September 10, 2002 | $500,000.00 |
| October 3, 2002 | $430,000.00 |
| October 24, 2002 | $600,000.00 |
| November 18, 2002 | $690,000.00 |
| November 30, 2002 | $1,000,000.00 |
| **Total for 2002** | **$9,605,000.00** |
| | |
| January 13, 2003 | $250,000.00 |
| February 6, 2003 | $1,200,000.00 |
| June 20, 2003 | $575,000.00 |
| July 25, 2003 | $900.000.00 |
| August 25, 2003 | $500,000.00 |
| September 10, 2003 | $1,250,000.00 |
| September 30, 2003 | $1,000.000.00 |
| October 6, 2003 | $400,000.00 |
| October 7, 2003 | $300,000.00 |
| October 28, 2003 | $1,200,000.00 |
| November 26, 2003 | $1,305,000.00 |
| **Total for 2003** | **$8,880,000.00** |
| | |
| March 22, 2004 | $1,000,000.00 |
| May 5, 1004 | $4,000,000.00 |

| May 26, 2004 | $875,000.00 |
| November 16, 2004 | $800,000.00 |
| December 8, 2004 | $800,000.00 |
| **Total for 2004** | **$7,475,000.00** |

91.     Each of these loans was made in reliance on statements by Devine to Allen, which were conveyed over the telephone with Allen located in New York and Devine located in his office in Illinois, his home in Utah, or while traveling to Nevada, California, Florida, and other states for business or other reasons.

92.     Devine routinely told Allen that the funds he was asking Allen to send to Superior were needed to cover present expenses related to Superior's radio business, or to complete business transactions that he misrepresented to be in the process of being finalized. Accordingly, Allen would routinely direct the wire of the funds the same day he spoke with Devine or shortly thereafter.   In each instance and at all relevant times, Devine's representations regarding the use of the funds and the need for Allen to wire them forthwith were false because Superior was in fact inactive as a business entity.

93.     In fact, Devine intended at all times to use the proceeds to benefit himself and Buzil, and indeed never used the money to benefit Superior.

94.     Beginning in summer 2004 and continuing throughout 2005, Devine also told Allen that Superior was participating in FCC auctions of construction permits for the right to build radio stations in certain large urban markets.  These construction permits were valuable because they often represented the last or penultimate FM radio station that could be built in a particular market.

95.     Allen loaned tremendous sums of money to Superior in 2005, as reflected in the following table, including loans of $6,300,000 on September 23, 2005, $10,000,000 on October

5, 2004, and $7,000,000 on November 2, 2005:

| Date | Amount |
|---|---|
| January 25, 2005 | $3,500,000 |
| March 11, 2005 | $2,200,000 |
| April 1, 2005 | $1,000,000 |
| September 23, 2005 | $6,300,000 |
| October 5, 2005 | $10,000,000 |
| November 2, 2005 | $7,000,000 |
| December 19, 2005 | $2,200,000 |
| December 20, 2005 | $1,000,000 |
| **Total:** | **$33,200,000** |

96.    By September 2005, Allen had exhausted his available liquid assets. During this month, Devine pressed Allen for more money for Superior, but Allen resisted selling assets or taking out loans to raise capital.

97.    During late September and October 2005, Devine told Allen that Superior was in financial trouble. He threatened Allen with the prospect of losing the assets and valuable business that were purportedly owned and operated by Superior, and told Allen that the only way to avoid losing the monies that Allen had already wired to Superior was to put additional monies into the company.

98.    In addition, as discussed in detail below, Devine told Allen that he had been physically threatened by Richard Davis, an individual who had also loaned money to Superior. Devine asked Allen to pay the debt owed to Davis, telling Allen that the debt was owed by Superior and that a payment by Allen would benefit Superior by reducing its debt obligations.

99.    Devine repeatedly urged Allen to leverage his bond portfolio, promising that the returns from his investments in Superior and its supposedly existing radio station assets would more than pay for any interest Allen might have to pay to borrow additional funds. Allen

initially refused, but Devine persisted, ultimately agreeing in September 2005 to pay the interest due on any loan Allen took against his bond portfolio. In reliance on this promise and Devine's other misrepresentations, Allen took out over $20 million in loans against his bond portfolio and wired the proceeds to Superior in September and October 2005 (as summarized in the chart above)).

100.     These representations were false. Devine and Buzil used the funds Allen loaned in the belief that he was lending to Superior in 2004 and 2005 to line their own pockets, to fund business ventures that they controlled but in which Allen did not hold an interest, and to pay back Davis on loans he made to Superior as well as separate entities controlled by Devine and Buzil.

### *From At Least 2001 to 2006, Defendants Wire False Financial Statements to Help Carry Out the Fraudulent Scheme*

101.     A key means of furthering the fraudulent scheme was the provision of false financial statements. In or before November 2001, in furtherance of the fraudulent scheme, Devine began sending Allen one-page weekly cash flow statements (the "Cash Flow Statements") showing Superior's supposedly healthy financial condition. Devine issued these statements regularly through at least February 2006. He faxed them from his office in Chicago, Illinois to Allen's home in Port Washington, New York. These statements were prepared by Devine or under his supervision and control by the accounting staff at Devine and Buzil's offices in Chicago, which same accounting staff performed accounting services for the Devine/Buzil LLCs.

102.     The Cash Flow Statements paint Superior as an extremely healthy company with significant collections on receivables and substantial cash on hand. They are remarkably

consistent, and in fact show the growth of Superior's receivables and collections. Devine verbally corroborated this rosy picture, telling Allen that Superior was purchasing assets, generating cash, and raising the value of the assets it had purchased through engineering upgrades and other efforts.

103.    Allen reviewed the Cash Flow Statements and believed that they presented an accurate picture of Superior's financial status. In reliance on the false financial statements as well as Devine's oral corroboration of the information they contained, Allen loaned Superior additional millions of dollars from 2002 through 2006. Copies of many of the Cash Flow Statements from 2005 are attached hereto as Exhibit 1.

104.    Devine and Buzil falsely represented in the Cash Flow Statements that Superior had significant receivables on which it was making timely and significant collections, thus generating substantial cash on hand.

105.    For example, the April 15, 2002 Statement lists collections of $1,000,000 and cash on hand of $2,200,000. The Statement lists total receivables of $2,470,000; "receivables 30 days" of $1,908,000; "receivables 60 days" of $512,000 and "receivables 90 days" of $50,000.

106.    The August 12, 2002 Statement lists collections of $1,150,000 and cash on hand of $4,100,000. The Statement lists total receivables of $4,270,000; "receivables 30 days" of $3,000,000; "receivables 60 days" of zero and "receivables 90 days" of $50,000.

107.    The April 7, 2003 Statement lists collections of $5,200,000 and cash on hand of $1,400,000. The Statement lists total receivables of $5,200,000; "receivables 30 days" of $3,300,000; "receivables 60 days" of $50,000 and "receivables 90 days" of $50,000.

108.    The June 28, 2004 Statement lists collections of $7,200,000 and cash on hand of $3,000,000. The Statement lists total receivables of $52,000,000; "receivables 30 days" of

$44,200,000; "receivables 60 days" of $5,800 and "receivables 90 days" of $1,200,000.

109.   Similarly, the March 7, 2005 Statement lists collections of $14,000,000 and cash on hand of $2,000,000.  The Statement lists total receivables of $52,000,000; "receivables 30 days" of $40,000,000; "receivables 60 days" of $12,000,000 and "receivables 90 days" of $0.

110.   Devine created two Cash Flow Statements dated September 26, 2005.  The first September 26 Statement lists collections of $9,259,000 and cash of $1,891,000.  The Statement lists total receivables of $65,109,000; "receivables 30 days" of $64,091,000; "receivables 60 days" of $1,081,000 and "receivables 90 days" of $0.

111.   The second September Statement lists collections of $8,672,000 and cash on hand of $2,397,000.  The Statement lists total receivables of $23,868,000; "receivables 30 days" of $22,760,000; "receivables 60 days" of $1,018,000 and "receivables 90 days" of $0.

112.   On the second September 26 Statement, there is a note regarding the cash on hand figure that states: "Does not include $10 million invested ($6.3 from CR Allen III)."

113.   The Cash Flow Statements created by Devine were entirely false.

114.   In fact, Superior was a shell company with no receivables, no collections, no assets, and no capital other than the funds that Devine and Buzil induced Allen to wire.

115.   Instead of funding Superior's acquisition of assets and operations, the money Allen wired for Superior's use had been siphoned elsewhere to finance other ventures of Devine and Buzil; to pay Devine and Buzil handsome salaries, bonuses, and consulting fees; and to pay exorbitant interest and principal on loans made to Devine and Buzil and their separate entities.

116.   Further, Devine and Buzil had allowed other borrowers to take priority interests in the radio stations and other valuable radio assets that had been purchased for other of the Devine/Buzil LLCs with Allen's money.

22

117.    Devine also sent Allen written statements listing the purported debt of Superior and so-called "related entities" as of January 1, 2005. One of those was sent on or before March 16, 2005, as it bears a fax header stating that it was faxed to Allen on March 16.

118.    Even though Superior had executed promissory notes for $18.4 million payable to Davis's company Excelsior Capital, Devine's statement listed the "Original Principle" owed to Excelsior as $12.4 million, thereby misrepresenting Superior's financial condition.

119.    This listing of debt also misrepresented the dates the loans to Excelsior were to come due, setting the due dates farther in the future. Devine made these and other misrepresentations regarding Superior's debt in order to convey the false impression that Superior was in good financial condition and to conceal the misuse of the funds Allen had wired to Superior.

120.    Devine also listed on the statement debt payable to Wells Fargo and CIT by Superior. Though Devine falsely represented Wells Fargo and CIT to Allen as creditors of Superior, in fact, those companies had never loaned money to Superior.

121.    Devine listed these financial institutions as creditors of Superior as part of his effort to misrepresent Superior as a real company with real operations and assets, to which established financial institutions had agreed to lend, rather than the shell it was.

### Devine and Buzil Use Richard Davis to Further Their Fraud

122.    Devine and Buzil also conspired with a third party, Richard Davis, to mutually enrich themselves at Allen's expense. Davis was a neighbor of Allen's, who was initially introduced by Allen to Devine and Buzil.

123.    In Davis, Devine and Buzil seem to have recognized a kindred spirit.

124.    Devine and Buzil began borrowing money from Davis for Superior (which

monies they promptly diverted), other LLCs controlled by Devine and Buzil, and themselves personally.  Devine and Buzil then used Allen's money instead of their own to pay back those loans, plus a hefty kicker of interest.

125.    Like Devine, Davis, who is thirty years Allen's junior, began meeting with Allen every day.  Davis visited Allen at his home each day, regularly bringing "gifts" for Allen and Mrs. Allen, including purchasing over $22,000 worth of slippers for Allen.  Unbeknownst to Allen, Devine and Buzil reimbursed Davis for these "gifts" through checks issued by Superior.

126.    As another token of their supposed friendship, Davis purported to "give" Allen (who does not drive) a luxury Bentley automobile.  Unbeknownst to Allen, Davis received a promissory note from an LLC controlled by Devine and Buzil in the amount of $250,000 for his supposed "gift" to Allen.  Devine and Buzil then reduced Superior's outstanding debt for the massive amounts loaned to it by Allen by $250,000.  Thus, again unknowingly, Allen paid for the Bentley "gift."

127.    Davis, Buzil, and Devine played the same sort of shell game with loans.

128.    Davis also made personal "loans" to Devine and Buzil and to some of the Devine/Buzil LLCs, at unreasonably high annualized rates of return ranging from 25 to 150%.

129.    Devine and Buzil used Allen's money (which had been contributed to Superior) to repay the personal "loans" Davis had made to them and certain of the Devine/Buzil LLCs, plus interest.  In total, more than $23 million of Allen's money flowed to Davis through this scheme.

130.    Davis also purported to loan money to Superior, both directly and through his single-member limited liability company, Excelsior Capital LLC.

131.    Davis has not taken any action against Buzil or Devine, despite knowing full well that they and other entities controlled by them are the actual recipients of whatever monies he

24

contributed to Superior.

132.    In sum, Devine and Buzil used Davis's loans to enrich themselves at Allen's expense. Their goal was for money to travel from Allen to Davis, via Buzil and Devine, by means of either payment of unreasonably high interest rates on personal loans, or by positioning Allen to indemnify Superior's debt remaining after it had been looted by Buzil and Devine.

### *Allen Provides Significant Additional Funds in 2005 Based on Devine and Buzil's Continuing False Statements that they were Necessary for Superior's Operations and Debt Obligations*

133.    In or about September and October 2005, Devine induced Allen to loan a further $17 million to Superior purportedly to satisfy legitimate business debts owed by Superior to Richard Davis through his company Excelsior. Devine told Allen that Davis had threatened him with bodily harm if he was not paid. Because of Allen's continued affection for and trust in Devine, Allen became extremely fearful that Davis would hurt Devine if Superior's debts to Excelsior were not paid. Devine also made it clear to Allen that if something were to happen to him, the assets and value of Superior would very likely suffer catastrophic losses.

134.    Based on Devine's representations that the money was desperately needed for and would be used to pay legitimate business debts of Superior, Allen wired $10 million to Superior on October 5, 2005 and $7 million on November 2, 2005.

135.    Devine executed promissory notes on behalf of Superior payable on demand to Allen for a total of $17 million. These promissory notes were made in connection with assurances that the funds were to be used for Superior's benefit to pay existing debts, and that not only would Allen be repaid in the future, but that Superior would have sufficient assets to pay the entire amount of the promissory note.

136.    Devine never intended to use the additional $17 million he fraudulently induced

Allen to contribute to pay obligations owed by Superior, and in fact Superior could not have had legitimate business debts because it had no business. As had become a pattern, Devine used Allen's $17 million, to repay, among other things, principal and interest related to loans that had been made either to him personally or to Lakeshore Media, one of the Devine/Buzil LLCs (but which Devine had personally guaranteed).

137.    Similarly, Allen loaned $3.2 million to Superior in December 2005, again based on representations by Devine to the effect that Superior needed the money to pay off business debts.

138.    Allen's $3.2 million was actually used to partially satisfy a $1 million debt owed by Devine and Buzil personally and a $3 million debt owed by Devine and Buzil's company Lakeshore Media that was secured by personal guaranties executed by Devine and Buzil. Lakeshore Media had transferred over $4 million to Richard Davis just days before Allen made his loans.

139.    Devine and Buzil used Allen's $3.2 million payment not for Superior's benefit, but to replace the funds Lakeshore had just paid to Davis or for other purposes that benefitted Devine, Buzil and Davis personally and not Superior or Allen.

140.    At Devine's direction, the wires comprising the $3.2 million that Allen intended to benefit Superior were made to companies controlled by Devine and Buzil: $2.2 million was wired on December 19, 2005 to ACB Consulting, and $1 million was wired on December 20, 2005 to Mag Mile Media.

141.    On December 20, 2005, Devine executed a promissory note on behalf of Superior Broadcasting for $1 million. The earlier $2.2 million loan was not memorialized until February 24, 2006, when Devine executed a $2.35 million promissory note payable by Superior to Allen.

Case 2:09-cv-00668-ARL   Document 96   Filed 12/15/09   Page 27 of 64 PageID #: 2450

These documents confirmed to Allen Devine's prior oral representation that, despite Devine's instruction that the funds be wired to entities other than Superior, the funds were necessary for Superior's business needs.

142.    The ugly picture that emerges from the pattern of wires is that Devine and Buzil used funds under their own control to pay back Davis's loans to Superior, themselves, and other entities, with a hefty interest premium. Devine and Buzil then reimbursed themselves with the money they obtained from Allen. Of course, none of this information was conveyed to Allen, who understood that he was loaning money to Superior to fund its (in actuality, non-existent) business operations and investments.

### Devine Continues to Extract More Money From Allen In 2005 and 2006 Despite Warnings that Allen Does Not Understand his Financial Affairs

143.    Beginning in late 2005 and throughout 2006, Allen's family and legal advisors became suspicious of Devine's statements to Allen. In an effort to placate Allen and his advisors, Devine agreed to make certain payments to repay money Allen had invested in Superior. From August to November 2005, Devine made six payments of $500,000 each to an escrow account at Arnold & Porter, attorneys for Allen.

144.    In January 2006, however, Devine told Allen that he needed the money back. After sustained hectoring by Devine, Allen succumbed, and directed Arnold & Porter to return the $3 million to Superior. Arnold & Porter promptly did so.

145.    Even as Allen's family and legal advisors were beginning to investigate Allen's dealings with Devine and Buzil, to evade scrutiny and continue the fraud, Devine continued to contact Allen directly to try to squeeze even more money from him. Devine engaged in this conduct despite the fact that lawyers and family members acting to protect Allen specifically

apprised Devine of Allen's impaired mental and physical condition.[1]

146.    Devine used his regular phone calls and other contacts with Allen to induce still

more wire transfers.  The following table lists the wires Allen made to Superior in 2006:

| Date | Amount |
|------|--------|
| March 8, 2006 | $1,000,000.00 |
| March 15, 2006 | $900,000.00 |
| March 17, 2006 | $1,200,000.00 |
| May 11, 2006 | $400,000.00 |
| May 16, 2006 | $300,000.00 |
| May 16, 2006 | $450,000.00 |
| June 8, 2006 | $1,000.000.00 |
| July 10, 2006 | $850,000.00 |
| July 10, 2006 | $400,000.00 |
| July 19, 2006 | $2,000,000.00 |
| August 23, 2006 | $365,000.00 |
| September 22, 2006 | $200,000.00 |
| October 26, 2006 | $300,000.00 |
| November 6, 2006 | $300,000.00 |
| December 11, 2006 | $230,000.00 |
| **Total** | **$9,895,000.00** |

147.    Even while Allen's concerned lawyers and family were pressing Devine for

information regarding his past investments and the economic situation with Davis, Devine

continued to urge Allen to wire funds to Superior.  Devine knew that because of his purported

personal friendship with Allen he could convince him to wire additional funds.  Devine used his

direct contacts because he knew that Allen's family and attorney would protect Allen's interests

and funds from Devine.  In the meantime, Devine was able to hold off Allen's advisors by

providing small amounts of information and making repeated promises of more, while using his

purported need to attend to Superior's "business" as an excuse.  Devine would provide this

---

[1] Devine, of course, had been well aware of these facts the entire time, since he spoke with Allen daily.

information by e-mail as well as through packages sent by Federal Express and similar common carriers.

148.    Devine also continued to make false representations to Allen about Superior's economic status, including stating that Superior owned radio stations.

149.    Ultimately, Allen depleted all his liquid assets to keep up with Devine's demands for ever more money, and, as discussed above, borrowed against his bond portfolio at Devine's urging.

150.    Occasionally, Devine and Buzil did wire small amounts of money to Allen in repayment of prior loans – usually right before they needed a large infusion of cash.   Overall, however, almost $70 million of Allen's money has never been repaid.

### The Scheme Enriches Defendants

151.    Though Allen was told that his funds were being used to purchase radio stations and construction permits for Superior, and to develop existing radio station assets, the money was actually used to purchase stations and permits for the Devine/Buzil LLCs, separate entities whose membership interests were owned primarily by Devine and Buzil.   For each Devine/Buzil LLC that actually acquired a radio station or construction permit with Allen's money instead of Superior, Devine and Buzil held 50.1% or more of the ownership interests, either directly or through trusts controlled by Devine, including trusts known as the Northland Holdings Trust and the New Bedford Trust (Devine owns a house on New Bedford Road in Salt Lake City). Devine's wife and children are beneficiaries of at least some of these trusts.

152.    The Devine/Buzil LLCs that bought stations, licenses, construction permits, or other radio broadcasting assets with Allen's money intended for Superior include defendants Lakeshore Media, LLC, Millcreek Broadcasting, LLC, College Creek Media, LLC, Marathon

29

Media Group, LLC, 3 Point Media – Salt Lake City, LLC, 3 Point Media Delta, LLC, 3 Point

Media – Utah, LLC, 3 Point Media – Franklin, LLC, 3 Point Media – Prescott Valley, LLC, 3

Point Media – Coalville LLC, 3 Point Media - Arizona, LLC, 3 Point Media - Florida, LLC, 3

Point Media - Kansas, LLC, 3 Point Media - Ogden, LLC, 3 Point Media - San Francisco, LLC,

MidValley Radio Partners, LLC, D&B Towers LLC, Superior Broadcasting Of Nevada, LLC,

Superior Broadcasting Of Denver, LLC, Wackenburg Associates, LLC, Portland Broadcasting

LLC, Desert Sky Media LLC, and Sky Media LLC.

153.    As officers and directors of Superior, Devine and Buzil had a duty not to engage

in self-dealing that they repeatedly and flagrantly violated.  Devine and Buzil affirmatively

assured Allen on numerous occasions that they were acting and would continue to act in

Superior's best interests.  But Devine and Buzil completely disregarded their fiduciary

obligations to Superior in favor of their own self interest by transferring funds out of Superior to

themselves and entities they controlled.

154.    These fund transfers from Superior to the Devine/Buzil LLCs were not

memorialized by any kind of written loan agreement nor made with any other indicia of an

arm's-length transaction.  Moreover, none of the Devine/Buzil LLCs recognizes Superior as a

legitimate creditor.  Accordingly, if one of the Devine/Buzil LLCs goes into bankruptcy,

Superior is not recognized as a creditor or a stakeholder of any kind.

155.    Buzil and Devine's self-dealing has already resulted in serious harm for Superior

and Allen as their house of cards has begun to unravel.  One of the Devine/Buzil LLCs,

Millcreek Broadcasting ("Millcreek"), recently went through bankruptcy.  Neither Superior nor

Allen was recognized as a creditor or equity stakeholder.  As a result of the bankruptcy,

Millcreek's assets – including those purchased with Allen's money – will now be owned by

hedge funds that loaned additional funds to Millcreek.

156.    When Devine and Buzil obtained funds for the Devine/Buzil LLCs, they did not inform the hedge funds and other lenders of the cash infusions those entities had received from Allen through Superior.  Accordingly, those lenders (who obtained security interests in the assets of the Devine/Buzil LLCs) were also misled regarding the true financial picture of the Devine/Buzil LLCs and the other entities in the enterprise.

157.    A significant portion of the funds Allen wired to Superior were simply embezzled by Devine (who controlled Superior's bank accounts) from Superior, used to fund his luxurious standard of living and put into accounts and investments controlled by him for his own personal benefit.  In addition to the Devine/Buzil LLCs, Devine also transferred significant sums to himself personally, to Buzil personally, and to entities they controlled, including Defendant ACB Consulting, Mag Mile Media, and others.  The transfers that personally enriched Devine and Buzil amount to at least $10 million but may be significantly more.

158.    For example, ACB Consulting – one of Devine and Buzil's entities – received over $3.2 million of Allen's money through transfers from Superior funded by Allen.  In addition, as discussed above, on or about December 19, 2005, Devine convinced Allen to wire $2.2 million directly to ACB Consulting, asserting that the funds would be used for Superior's benefit.  Devine later confirmed these statements by executing a promissory note to Allen payable by Superior including the amount wired to ACB Consulting.  But ACB Consulting did not provide any services to Superior or Allen in return for this money or do anything to benefit Superior or Allen in return for the money it received.  Instead, ACB Consulting appears to be simply a means by which Devine diverted money from Superior and Allen to his own bank account.

31

159.    Devine also used Allen's money to fund other businesses of himself and Buzil, including defendant Devine Racing.  Devine Racing, and other entities controlled by Devine and Buzil, manages marathons and other long-distance running and sporting events in Chicago, Los Angeles, and Las Vegas, among other locations.

160.    Buzil was aware of these transfers and benefitted directly from them, drawing significant salaries from both Superior and Lakeshore Media.  In addition, as noted above, Buzil received equity interests in the Devine/Buzil LLCs and is also a co-owner of Devine Racing and other entities.

161.    Devine and Buzil used Allen's funds to pay loans owed by Devine and Buzil, as well as debts owed to third parties by their LLCs Lakeshore Media and 3 Point Media of Prescott Valley.

162.    For example, Superior's accounting records (which were entirely controlled by Devine and Buzil and reflect only the information they chose to memorialize) show that at least $10 million of the funds received from Allen were used to pay Davis back on loans he had made to Devine and Buzil personally, and to reward him with extortionate rates of interest.  Davis refuses to credit these payments – made entirely with Allen's money diverted from Superior – toward amounts that Davis alleges are owed to him by Superior or Allen (who purportedly guarantied certain of Superior's loans from Excelsior).

163.    As stated in detail above, Allen transferred funds to Superior based on specific representations by Devine that the funds would be used to fund Superior's business activities. Ironically, however, in the one instance where Allen loaned money to Superior directly to pay a creditor of Superior – Excelsior – neither Allen nor Superior received the benefit of reducing Superior's debt to Excelsior, despite Devine and Buzil's promises that the funds would be used

for just that purpose.

### *The Fraud Finally Comes to Light in 2007 After Stymied Attempts to Learn More in 2005 and 2006*

164.    As noted above, in late 2005, Allen's family learned about the over $23 million he had loaned to Superior in September and October. Allen's family was particularly concerned given Allen's deteriorating mental and physical condition. They asked Robert Wessely ("Wessely"), a corporate attorney with the firm of Arnold & Porter who had represented the Allen family on certain matters in the past, to speak with Devine and Buzil in an effort to learn more about where the money had gone.

165.    In addition, Allen's son Luke began to realize that his father needed his help with regard to business dealings with Devine.

166.    Initially, Devine and Buzil parried requests for information from Wessely and Luke, providing only a minimal amount of data.

167.    At the same time, Devine and Buzil continued to press Allen to make additional loans to Superior to fund their personal expenses and outside business interests.

168.    By the end of 2007, however, Allen's advisors had been able to obtain enough information from Devine, Buzil, and their colleagues to determine that, contrary to the express promises Devine made to Allen, Superior not only did not own any radio stations, it basically had no assets or operations at all. Instead of the robust entity with strong cash-flow and valuable assets that Devine had painted, Superior was in fact just a shell through which Allen's money flowed to personal and business enterprises run for the benefit of Devine and Buzil and their colleagues. The records of Superior show that many checks were mailed or transmitted via the mails and interstate carriers in furtherance of the scheme, including the series of checks sent by

33

Federal Express to Richard Davis.

169.     In November 2007, Luke assumed control of Superior, and is now its President.

170.     Superior has no assets against which Allen could recover in a civil action. It owns no radio stations, did not conduct any known business operations, and has been stripped by Defendants of all the millions that Allen contributed over the years.

### Count One (RICO) (Against Devine and Buzil)

171.     Plaintiff repeats and realleges each of the allegations made in paragraphs 1 through 170 of the Complaint as though fully set forth herein.

172.     The full scope of Defendants' wrongdoing is unknown and Plaintiffs' investigation of the same continues.

173.     As the complete nature of Defendants' conduct is uniquely within the possession of Defendants and their accomplices, known and unknown, the full extent of their wrongdoing will not be known until full discovery is had.

### RICO Persons

174.     Devine and Buzil are each a person within the meaning of 18 U.S.C. § 1961(3).

### RICO Enterprise

175.     Devine and Buzil, together with Superior, Devine Racing, ACB Consulting, and the network of limited liability companies referred to herein as the Devine/Buzil LLCs, comprise an association-in-fact enterprise. Devine and Buzil conducted, directed, and participated in the conduct of the enterprise's affairs through a pattern of racketeering activity.

176.     The Devine/Buzil LLCs are operated out of a central office in Chicago, Illinois, which handles the finances for their operations.

177.     Devine and Buzil were each associated with the enterprise, and had authority

34

within the enterprise and/or conducted or participated in the unlawful conduct set forth herein.

178.   Devine and Buzil were the principal architects of, and conducted the enterprise's affairs through, the pattern of racketeering activity set forth herein.

179.   Devine and Buzil have done business together continuously over a period of over twenty years, cooperating on numerous business ventures including the Devine/Buzil LLCs and Devine Racing.

180.   In so doing, Buzil and Devine have shared a common purpose to defraud Allen and have worked together to carry out those purposes.

181.   Together, they have created a structure whereby Devine acts as President or similar chief executive role, and Buzil in a Vice President or similar role, in forming and operating limited liability companies involved in different aspects of the radio business including owning and developing radio stations, expanding stations to different markets, and providing financial and management services to support those activities.

182.   Over the years, in addition to the pattern of racketeering activity set forth herein, the Devine-Buzil enterprise (excepting Superior) also has carried out legitimate purposes such as owning and operating radio stations and operating marathon races in Los Angeles, Chicago, and elsewhere through Devine Racing and other entities.

Effect on Interstate Commerce

183.   The association-in-fact enterprise described above engages in and affects interstate commerce by acts including the transmission of monies across state lines (including from Superior to other ventures) and the operation of radio stations broadcasting across state lines and by conducting economic activity in various States.

35

Predicate Acts

184.    Devine and Buzil conducted, engaged in, or participated in a pattern of predicate

acts through the enterprise described above, including the commission of numerous violations of

the Federal Mail Fraud Statute, 18 U.S.C. § 1341 and the Federal Wire Fraud Statute, 18 U.S.C.

§ 1343, by making telephone calls across state lines in furtherance of the fraud (including Devine

and Buzil's calls to Allen wherein they affirmatively misrepresented Superior's assets and

operations), faxing fraudulent financial statements of Superior, and soliciting and receiving bank

wires from New York to Illinois.

185.    On information and belief, the wires and mails also were used to transfer funds

from Superior's accounts to the accounts of Devine, Buzil, the Devine/Buzil LLCs, Devine

Racing, ACB Consulting, and various affiliates that were component parts of the enterprise, and

to mail payroll information, loan documents, and other business documents that furthered the

operations of those component parts.  In addition, checks were sent by interstate carriers to

Richard Davis (including payments funded by Allen) in furtherance of the scheme to defraud

Allen.

186.    Each of Devine and Buzil knowingly used or caused to be used the mails and

wires to be used with the specific intent to deceive and defraud, and in furtherance of a scheme

or artifice to defraud.

187.    The false representations included false promises to use Allen's money to fund

business operations of Superior that did not exist, false promises to repay the money, and

falsified financial statements of Superior.

188.    By the above acts, Devine and Buzil committed money laundering in violation of

18 U.S.C. § 1956.  In particular, Devine and Buzil caused Allen to wire money to Superior and

36

other entities through a pattern of mail and wire fraud. The proceeds of such fraud were then transferred by wires and other financial transactions to further the scheme by funding the Devine/Buzil LLCs, Devine Racing, ACB Consulting, and other businesses controlled by Devine and Buzil. In addition, with knowledge that the funds had been fraudulently obtained, Devine and Buzil transferred money to themselves, either directly or through ACB Consulting and other entities, thus furthering the scheme by rewarding themselves. By conducting these financial transactions transferring Allen's money out of Superior and into and sometimes out of their web of companies (which owned radio assets in many different states), Devine and Buzil concealed, and intended to conceal, the source, nature, and/or ownership of these funds, making it more difficult to trace the flow of Allen's funds.

189.    In particular, Devine and Buzil transferred Allen's money through Lakeshore into other Devine/Buzil LLCs, but also transferred funds between Devine/Buzil LLCs. None of these transfers are memorialized in promissory notes or other documents. Instead, Devine and Buzil simply recorded them as intercompany transfers, despite the separate ownership and interests of Superior on the one hand, and Lakeshore, the Devine/Buzil LLCs, Devine Racing, and ACB Consulting, on the other.

190.    By the above acts, Devine and Buzil further caused stolen property to be transferred across state lines, in violation of 18 U.S.C. § 2314.

191.    By the above acts, Devine and Buzil fraudulently and wrongfully obtained funds in the custody or control of a financial institution, in violation of 18 U.S.C. § 1344.

192.    By causing Allen to fear for the security of his property, and to fear the loss of funds already invested if he did not wire additional funds, Devine and Buzil committed acts of extortion in violation of 18 U.S.C. § 1951.

37

### Pattern of Racketeering

193.    The above criminal acts were done in furtherance of and for the purpose of executing a unified fraudulent scheme to harm Plaintiff, and were related to one another as part of the scheme including common participants, a common target, and the common purpose and common result of defrauding Allen.

194.    Each of Defendants Devine and Buzil directly and indirectly conducted and participated in conducting the affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

195.    The predicate acts making up the scheme began at least as early as 2000 and lasted for more than two years, continuing at least through the end of 2006.

196.    Should Allen's financial guardianship cease, such acts also are capable of repetition indefinitely.

### Damages

197.    Devine and Buzil invested the proceeds of racketeering conduct in their Devine/Buzil LLCs and other businesses that form an enterprise affecting interstate commerce, instead of in Superior, in violation of 18 U.S.C. § 1962(a).

198.    Devine and Buzil also obtained funds directly through acts of racketeering described above, and directly harmed Allen by defrauding him, in violation of 18 U.S.C. § 1962(c).

199.    Because Defendants never actually contributed the monies loaned to Superior to Superior and/or diverted monies that were contributed to Superior in furtherance of their scheme, and did not otherwise capitalize or otherwise run Superior despite their fraudulent representations to the contrary, their racketeering acts caused Plaintiff to lose any chance of

recovering those funds.

200.    As a direct result of Defendants' predicate acts and RICO violation, Plaintiff has been damaged in his business or property and is entitled to damages in an amount to be determined at trial.

201.    Pursuant to RICO, 18 U.S.C. § 1964(c), Plaintiff is entitled to recover threefold its damages plus costs and attorneys' fees.

### Count Two (RICO Conspiracy) (Against Devine and Buzil)

202.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 201 above as if fully set forth herein.

203.    As set forth in detail above, Devine and Buzil agreed to commit predicate acts, including mail and wire fraud, transportation of stolen property across state lines, fraudulently obtaining funds in the custody or control of a financial institution, extortion, and money laundering. Devine and Buzil knew that these predicate acts, which were repeated many times over the period of 2000 through 2006 at least, were part of a pattern of racketeering activity.

204.    Devine and Buzil took a myriad of actions in furtherance of the RICO conspiracy, including committing the predicate acts; ingratiating themselves with Allen through in-person visits, phone calls, and procuring items and doing other favors; running the Devine/Buzil LLCs with Allen's money (as funneled through Superior); using Allen's money to pay themselves both directly and through entities under their control; providing misinformation to Allen's advisors when they sought to understand what had happened to Allen's money; and using Allen's money to pay Richard Davis (both directly and through his company Excelsior Capital) interest and principal on loans made to themselves and their entities.

205.    As detailed above, these actions, as well as others, were part of the agreed effort

39

to extract over $70 million from Allen, for which he received essentially nothing in return.

206.    As a direct result of Defendants' conspiracy to violate RICO (18 U.S.C. 1962(d)), Plaintiff has been damaged in his business or property and is entitled to damages in an amount to be determined at trial.

207.    Pursuant to RICO, 18 U.S.C. § 1964(c), Plaintiff is entitled to recover threefold its damages plus costs and attorneys' fees.

<strong><u>Count Three (Fraud) (Against Devine and Buzil)</u></strong>

208.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 207 above as if fully set forth herein.

209.    As set forth above, defendants Devine and Buzil misrepresented material facts concerning Superior, including its financial status and business purposes, to induce Allen to invest in Superior.  Devine and Buzil also misrepresented the uses to which such investments would be put.  Devine and Buzil also omitted material information regarding Superior and the other businesses in which they invested Allen's money.

210.    Buzil and Devine knew that these representations were false when made, or acted with reckless disregard as to their truth.  They also intentionally omitted critical information that would have informed Allen of the truth regarding their scheme.

211.    Defendants further knew that Allen was relying on their misrepresentations and omissions and intended that Allen do so and to induce Allen to contribute monies in reliance on them.

212.    Devine and Buzil had a duty to disclose information to Allen based on their status as officers of Superior as well as the significantly greater knowledge they had regarding Superior and its purported business.  In addition, by design, Devine and Buzil placed Allen in a position

40

where had a relationship of trust and confidence in them, believing that they were acting in his best interests.

213.    Allen's reliance on Defendants' misrepresentations was reasonable.  In addition, Allen reasonably believed that Devine and Buzil were not fraudulently omitting critical information.

214.    As a result of Defendant's falsehoods and actionable omissions, Plaintiff has suffered damages in an amount to be determined at trial, but not less than $70 million.

215.    In committing the fraud described above, the Defendants acted willfully, voluntarily, maliciously and with conscious disregard of Allen's rights.  Accordingly, Plaintiff is entitled to punitive damages in an amount to be determined at trial.

## Count Four (Civil Conspiracy) (Against Devine, Buzil, the Devine/Buzil LLCs, Devine Racing, and ACB Consulting)

216.    Plaintiff repeats and realleges the statements set forth in paragraphs 1 to 215 above as if fully set forth herein.

217.    Devine, Buzil, the Devine/Buzil LLCs, Devine Racing, and ACB Consulting (collectively, the "Conspiracy Defendants") formed a common understanding and agreement to carry out unlawful acts against Allen.

218.    The Conspiracy Defendants shared a knowing and malicious intent to injure Allen and to wrongfully deprive and defraud him of property.

219.    The conspiracy was carried out by means of fraudulent acts by Devine and Buzil as described above, including acts done on behalf of the Devine/Buzil LLCs, Devine Racing, and ACB Consulting, which were done pursuant to and in furtherance of the common understanding and agreement.

220.    As a result of the Defendants' conspiracy, Plaintiff has suffered damages in an amount to be determined at trial.

## Count Five (Conversion) (Against Devine, Buzil, the Devine/Buzil LLCs, Devine Racing, ACB Consulting and the John Doe Defendants)

221.    Plaintiff repeats and realleges the statements set forth in paragraphs 1 to 220 above as if fully set forth herein.

222.    Allen has a right to possession of the funds that he provided to Devine and Buzil for Superior. Devine and Buzil should have used the funds for the purchase of radio stations and Superior's legitimate operating expenses, but they did not.

223.    Devine and Buzil had no authority to use Allen's monies for any purpose other than to fund Superior's purchase of radio stations or legitimate operating expenses, and knew that any other use was unauthorized and inconsistent with Allen's rights.

224.    Devine and Buzil disposed of Plaintiff's property, in large part by transferring it to themselves, the Devine/Buzil LLCs, Devine Racing, ACB Consulting, and to the John Doe defendants. Devine and Buzil controlled all of these entities, and thus the entities knew that they were receiving funds that had been converted from Allen.

225.    As a result of the foregoing, Defendants are liable for damages in an amount to be determined at trial.

## Count Six (Unjust Enrichment) (Against Devine, Buzil, the Devine/Buzil LLCs, Devine Racing, ACB Consulting and the John Doe Defendants)

226.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 225 above as if fully set forth herein.

227.    As set forth in detail above, Devine and Buzil obtained funds from Allen through a pattern of fraud, deceit, and breach of fiduciary duty. As much as $35 million of Allen's funds

42

were transferred to the Devine/Buzil LLCs. At least $500,000 of Allen's funds were transferred to Devine Racing. At least $5.5 million of Allen's funds were transferred to ACB Consulting (either through Superior or directly, to benefit Superior, according to Devine). An unknown amount has been transferred to the Devine and Buzil personally (either directly or through one or more of the Devine/Buzil LLCs or ACB Consulting) and the John Doe defendants.

228. The Devine/Buzil LLCs, Devine Racing, ACB Consulting, and the John Doe defendants provided no consideration in return for the transfers of funds they received. Equity and good conscience demands that these transfers be reversed, and Plaintiff refunded his money.

229. The Devine/Buzil LLCs, Devine Racing, ACB Consulting, and the John Doe defendants were thus unjustly enriched through the transfers of Allen's funds that they received.

230. Devine and Buzil are liable to Plaintiff for unjust enrichment because, as described herein, they participated in and profited from the wrongful expropriation of Allen's funds, and obtained money that in equity and good conscience should not have been obtained.

231. As a result of Defendants' unlawful misappropriations of Plaintiff's funds, they have been unjustly enriched in an amount to be determined at trial.

**Count Seven (Breach of Fiduciary Duty) (Against Devine and Buzil)**

232. Plaintiff repeats and realleges the allegations in paragraphs 1 through 231 above as if fully set forth herein.

233. Defendants are liable to Allen based on the loans they fraudulently induced from him.

234. Separately, defendants Buzil and Devine owed fiduciary duties to Allen in his capacity as a shareholder of Superior and because of their privity with him in directly infusing capital based on representations that it was needed to keep Superior afloat.

43

235.    Devine and Buzil also owed fiduciary duties to Allen because they placed him in a position of inferior information, such that he had to place his trust and confidence in them for information regarding Superior and its business operations.

236.    Defendants Buzil and Devine breached those duties by, among other things, failing to operate Superior prudently or indeed at all, failing to maintain books and records of Superior, and self-dealing in the form of personally taking assets intended for Superior.

237.    As a direct result of Defendants' breaches of the fiduciary duties owed to Superior and its shareholders, Plaintiff has no chance of recovering any of the monies he loaned to Superior.

238.    As a result, Plaintiff has been damaged in an amount to be determined at trial.

### Count Eight (Constructive Trust) (Against All Defendants)

239.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 238 above as if fully set forth herein.

240.    As set forth in detail above, Devine and Buzil defrauded Plaintiff and breached their fiduciary duty to him, using the funds he wired to Superior for their own benefit and to fund the Devine/Buzil LLCs, Devine Racing, ACB Consulting, and the John Doe Defendants.

241.    Plaintiff has been injured as a direct, proximate and foreseeable result of Devine and Buzil's conduct and has suffered damages as a result of the investments they made in the Devine/Buzil LLCs, Devine Racing, ACB Consulting, and the John Doe Defendants.

242.    Plaintiff seeks to impose a constructive trust on the investments Devine and Buzil made in the LLC Defendants, Devine Racing, ACB Consulting, and any John Doe Defendants yet to be discovered, which were wrongfully taken from Plaintiff and used to unfairly benefit Devine, Buzil, the Devine/Buzil LLCs, Devine Racing, ACB Consulting, and any John Doe

44

defendants that may be discovered.

243.   To the extent that Davis received monies from Allen as a result of the conduct described above, Plaintiff seeks to impose a constructive trust on such funds.

244.   Pursuant to the November 19, 2009 Decision and Order by Judge Spatt in this action, Plaintiff has added Richard Davis, Excelsior Capital, LLC, and Superior Broadcasting Co. as defendants to this claim for a constructive trust.

## **Prayer for Relief**

WHEREFORE, Allen respectfully requests that this Court enter judgment against Defendants, awarding Allen

(a)   actual damages to be determined at trial;

(b)   treble damages under 18 U.S.C. 1964;

(c)   punitive damages;

(d)   a constructive trust over the amounts invested in the Devine/Buzil LLCs, Devine Racing, ACB Consulting, and the John Doe Defendants;

(e)   an injunction on Devine, Buzil, the Devine/Buzil LLCs, Devine Racing, ACB Consulting, Richard Davis, and Excelsior Capital, LLC preventing the dissipation of any funds obtained from Allen and the sale or other transfer of any assets obtained in whole or in part with any funds obtained from Allen;

(f)   costs and disbursements of this action, including reasonable attorneys' fees;

(g)   pre- and post-judgment interest as allowed by law; and

(h)   all other and further relief, at law or in equity, as this Court may deem just and proper.

Dated:  New York, New York
       December 15, 2009

COHEN & GRESSER LLP

By: _____
       Lawrence T. Gresser (LG-2801)
       ltgresser@cohengresser.com

       Alexandra Wald (AW-0225)
       awald@cohengresser.com

       Nathaniel P.T. Read (NR-8807)
       nread@cohengresser.com

       100 Park Avenue, 23rd Floor
       New York, New York 10017
       Phone:  (212) 957-7600
       Facsimile:  (212) 957-4514

       *Attorneys for Plaintiff*

# Exhibit 1

# Superior Broadcasting In Million

**Ending Date:**    **3/14/05**

| | Receivables Total | Receivables 30 Days | Receivables 60 Days | Receivables 90 + Days |
|---|---|---|---|---|
| Beginning Receivable Balance: | $40,000 | $16,000 | $10,000 | $0 |
| Total Ending Receivable Balance | $26,000 | | | |
| Collections | $14,000 | | | |
| Expenditures | $8,000 | | | |
| Cash On Hand: | $6,000 | | | |

**Ending Date:**    **3/07/05**

| | Receivables Total | Receivables 30 Days | Receivables 60 Days | Receivables 90 + Days |
|---|---|---|---|---|
| Beginning Receivable Balance: | $66,000 | $40,000 | $12,000 | $0 |
| Total Ending Receivable Balance | $52,000 | | | |
| Collections | $14,000 | | | |
| Expenditures | $10,000 | | | |
| Cash On Hand: | $2,000 | | | |

RA09964

MHK-23-2005   00:04          C.R.HLLEN,111                          P.01/01

# Superior Broadcasting

**Ending Date:**   3/22/05

| | Receivables Total | Receivables 30 Days | Receivables 60 Days | Receivables 90 + Days |
|---|---|---|---|---|
| Beginning Receivable Balance: | $26,000 | $10,000 | $10,000 | $0 |
| Total Ending Receivable Balance | $20,000 | | | |
| Collections | $6,000 | | | |
| Expenditures | $6,000 | | | |
| Cash On Hand: | $6,000 | | | |

**Ending Date:**   3/14/05

| | Receivables Total | Receivables 30 Days | Receivables 60 Days | Receivables 90 + Days |
|---|---|---|---|---|
| Beginning Receivable Balance: | $40,000 | $16,000 | $10,000 | $0 |
| Total Ending Receivable Balance | $26,000 | | | |
| Collections | $14,000 | | | |
| Expenditures | $8,000 | | | |
| Cash On Hand: | $6,000 | | | |

07CG 10C7TC. XP-j

TOTAL P.01

RA09965

P.01/01

HAR-09-2005  00:55        C.R.ALLEN,III

## Superior Broadcasting

**Ending Date:**   4/4/05

|  | Receivables Total | Receivables 30 Days | Receivables 60 Days | Receivables 90 + Days |
|---|---|---|---|---|
| Beginning Receivable Balance: | $69,918 | $54,817 | $9,800 | $0 |
| Total Ending Receivable Balance | $64,617 | | | |
| Collections | $5,301 | | | |
| Expenditures | $6,263 | | | |
| Cash On Hand: | $4,738 | | | |

**Ending Date:**   3/28/05

|  | Receivables Total | Receivables 30 Days | Receivables 60 Days | Receivables 90 + Days |
|---|---|---|---|---|
| Beginning Receivable Balance: | $20,000 | $10,000 | $4,800 | $0 |
| Total Ending Receivable Balance | $14,800 | | | |
| Collections | $5,200 | | | |
| Expenditures | $5,500 | | | |
| Cash On Hand: | $5,700 | | | |

TOTAL P.01

RA05241

# Superior Broadcasting

**Ending Date:**     4/11/05

| | Receivables Total | Receivables 30 Days | Receivables 60 Days | Receivables 90 + Days |
|---|---|---|---|---|
| Beginning Receivable Balance: | $64,617 | $47,075 | $9,800 | $0 |
| Total Ending Receivable Balance | $56,875 | | | |
| Collections | $7,742 | | | |
| Expenditures | $7,122 | | | |
| Cash On Hand: | $5,358 | | | |

**Ending Date:**     4/4/05

| | Receivables Total | Receivables 30 Days | Receivables 60 Days | Receivables 90 + Days |
|---|---|---|---|---|
| Beginning Receivable Balance: | $69,918 | $54,817 | $9,800 | $0 |
| Total Ending Receivable Balance | $64,617 | | | |
| Collections | $5,301 | | | |
| Expenditures | $6,263 | | | |
| Cash On Hand: | $4,738 | | | |

RA05240

APR-25-2005  23:49        C.R.ALLEN,111                                              P.01/01

## Superior Broadcasting

**Ending Date:**     4/25/05

|  | Receivables Total | Receivables 30 Days | Receivables 60 Days | Receivables 90 + Days |
|---|---|---|---|---|
| Beginning Receivable Balance: | $56,875 | $40,099 | $9,800 | $0 |
| Total Ending Receivable Balance | $49,899 | | | |
| Collections | $6,976 | | | |
| Expenditures | $7,754 | | | |
| Cash On Hand: | $4,580 | | | |

**Ending Date:**     4/11/05

|  | Receivables Total | Receivables 30 Days | Receivables 60 Days | Receivables 90 + Days |
|---|---|---|---|---|
| Beginning Receivable Balance: | $64,617 | $47,075 | $9,800 | $0 |
| Total Ending Receivable Balance | $56,875 | | | |
| Collections | $7,742 | | | |
| Expenditures | $7,122 | | | |
| Cash On Hand: | $5,358 | | | |

RA09884

MHY-02-2005   23:10          C.R. ALLEN; 111                                        P.01/01

# Superior Broadcasting

**Ending Date:**   5/2/05

| | Receivables Total | Receivables 30 Days | Receivables 60 Days | Receivables 90 + Days |
|---|---|---|---|---|
| Beginning Receivable Balance: | $49,899 | $33,043 | $8,592 | $0 |
| Total Ending Receivable Balance | $41,635 | | | |
| Collections | $8,264 | | | |
| Expenditures | $6,736 | | | |
| Cash On Hand: | $6,108 | | | |

**Ending Date:**   4/25/05

| | Receivables Total | Receivables 30 Days | Receivables 60 Days | Receivables 90 + Days |
|---|---|---|---|---|
| Beginning Receivable Balance: | $56,875 | $40,099 | $9,800 | $0 |
| Total Ending Receivable Balance | $49,899 | | | |
| Collections | $6,976 | | | |
| Expenditures | $7,754 | | | |
| Cash On Hand: | $4,580 | | | |

TOTAL P.01

RA09885

## Superior Broadcasting

| Ending Date: 5/9/05 | Receivables Total | Receivables 30 Days | Receivables 60 Days | Receivables 90 + Days |
|---|---|---|---|---|
| | $41,635 | $25,909 | $8,592 | $0 |
| Beginning Receivable Balance: | | | | |
| Total Ending Receivable Balance | $34,501 | | | |
| Collections | $7,134 | | | |
| Expenditures | $7,219 | | | |
| Cash On Hand: | $6,023 | | | |

| Ending Date: 5/2/05 | Receivables Total | Receivables 30 Days | Receivables 60 Days | Receivables 90 + Days |
|---|---|---|---|---|
| | $48,899 | $33,043 | $8,592 | $0 |
| Beginning Receivable Balance: | | | | |
| Total Ending Receivable Balance | $41,635 | | | |
| Collections | $8,264 | | | |
| Expenditures | $6,736 | | | |
| Cash On Hand: | $6,108 | | | |

| Individual Investors | Original Principle | Amount Paid | Accrued Interest | | Interest & Principle Due Dec. 31, 2006 | |
|---|---|---|---|---|---|---|
| B. Buzil | $ .500 | | $ .36 | (6%) | $ .536 | |
| B. Neiman | $ 8.595 | | $ .5157 | (6%) | $ 9.1107 | |
| Monroe | $ 6.322 | | $ .379 | (6%) | $ 6.701 | |
| J. Edwards | $ .473 | | $ .042 | (6%) | $ .515 | |
| J. Leeds | $ 1. | | $ .060 | (6%) | $ 1.06 | |
| R. Davis | $ 14. | $6. | $ 2.232 | (18%) | $ 8. | ($8. million due 11/06) |
| *C.R. Allen | $ 40.2 | $8.2 (6%) | $ 2.28 | | $ 34.28 | ($11 million due by 05/15/05) |
| **C. Devine | $ 21.3 | $0. (4%) | | | $ 22.06 | ($3.2 due by 01/01/06) |
| Chase | $ 6. | $ .900 (5%) | $ 1.64 | | $ 6.74 | ($1 million due by .06/30/05) |
| ***Wells Fargo et al | $ 135. To be pd. June 1st | $7. (8%) | $ 10.24 | | $135.24 | (To be paid June 1") |
| Grand Total | $633.31 | | | | $609.32 | |

* Includes amount for Major Television & Music.
** Guaranteed loans from banks (Builders, etc...)
*** C. Devine personally guaranteed

RA09886

# Superior Broadcasting

**Ending Date:** 5/16/05

| | Receivables Total | Receivables 30 Days | Receivables 60 Days | Receivables 90 + Days |
|---|---|---|---|---|
| Beginning Receivable Balance: | $34,501 | $16,835 | $7,492 | $0 |
| Total Ending Receivable Balance: | $24,327 | | | |
| Collections: | $10,174 | | | |
| Expenditures: | $6,781 | | | |
| Cash On Hand: | $9,416 | | | |

**Ending Date:** 5/9/05

| | Receivables Total | Receivables 30 Days | Receivables 60 Days | Receivables 90 + Days |
|---|---|---|---|---|
| Beginning Receivable Balance: | $41,635 | $25,909 | $8,592 | $0 |
| Total Ending Receivable Balance: | $34,501 | | | |
| Collections: | $7,134 | | | |
| Expenditures: | $7,219 | | | |
| Cash On Hand: | $6,023 | | | |

RA09887

MAY-24-2005  00:09        C.R.ALLEN,111                                        P.01/02



# Superior Broadcasting

**Ending Date:** 5/23/05

|  | Receivables Total | Receivables 30 Days | Receivables 60 Days | Receivables 90 + Days |
|---|---|---|---|---|
| Beginning Receivable Balance: | $24,327 | $8,787 | $3,376 | $0 |
| Total Ending Receivable Balance: | $12,163 | | | |
| Collections: | $12,164 | | | |
| Expenditures: | $10,928 | | | |
| Cash On Hand: | $10,652 | | | |

**Ending Date:** 5/16/05

|  | Receivables Total | Receivables 30 Days | Receivables 60 Days | Receivables 90 + Days |
|---|---|---|---|---|
| Beginning Receivable Balance: | $34,501 | $16,835 | $7,492 | $0 |
| Total Ending Receivable Balance: | $24,327 | | | |
| Collections: | $10,174 | | | |
| Expenditures: | $6,781 | | | |
| Cash On Hand: | $9,416 | | | |

P.01    May 25 2005 10:21

RA05236

## Superior Broadcasting

Ending Date:        06/13/05

| | Receivables Total | Receivables 30 Days | Receivables 60 Days | Receivables 90 + Days |
|---|---|---|---|---|
| Beginning Receivable Balance: | $37,728 | $21,921 | $3,376 | $0 |
| Total Ending Receivable Balance: | $25,297 | | | |
| Collections: | $12,431 | | | |
| Expenditures: | $12,559 | | | |
| Cash On Hand: | $15,133 | | | |

Ending Date:        06/06/05

| | Receivables Total | Receivables 30 Days | Receivables 60 Days | Receivables 90 + Days |
|---|---|---|---|---|
| Beginning Receivable Balance: | $51,949 | $34,352 | $3,376 | $0 |
| Total Ending Receivable Balance: | $37,728 | | | |
| Collections: | $14,221 | | | |
| Expenditures: | $11,251 | | | |
| Cash On Hand: | $15,261 | | | |

RA10472

## Superior Broadcasting

Ending Date:    07/11/05: represent two weeks

|  | Receivables Total | Receivables 30 Days | Receivables 60 Days | Receivables 90 + Days |
|---|---|---|---|---|
| Beginning Receivable Balance: | $64,544 | $38,007 | $1,268 | $0 |
| Total Ending Receivable Balance: | $39,275 | | | |
| Collections: | $25,269 | | | |
| Expenditures: | $14,514 | | | |
| Cash On Hand: | $10,755 | | | |

Ending Date:    06/27/05

|  | Receivables Total | Receivables 30 Days | Receivables 60 Days | Receivables 90 + Days |
|---|---|---|---|---|
| Beginning Receivable Balance: | $77,215 | $63,276 | $1,268 | $0 |
| Total Ending Receivable Balance: | $64,544 | | | |
| Collections: | $12,671 | | | |
| Expenditures: | $18,208 | | | |
| Cash On Hand: | $9,701 | | | |

TOTAL P.01

RA09873

# Superior Broadcasting

Ending Date:        07/18/05

|  | Receivables Total | Receivables 30 Days | Receivables 60 Days | Receivables 90 + Days |
|---|---|---|---|---|
| Beginning Receivable Balance: | $39,275 | $24,322 | $1,268 | $0 |
| Total Ending Receivable Balance: | $25,590 | | | |
| Collections: | $13,685 | | | |
| Expenditures: | $13,312 | | | |
| Cash On Hand: | $11,128 | | | |

Ending Date:        07/11/05: represent two weeks

|  | Receivables Total | Receivables 30 Days | Receivables 60 Days | Receivables 90 + Days |
|---|---|---|---|---|
| Beginning Receivable Balance: | $64,544 | $38,007 | $1,268 | $0 |
| Total Ending Receivable Balance: | $39,275 | | | |
| Collections: | $25,269 | | | |
| Expenditures: | $14,514 | | | |
| Cash On Hand: | $10,755 | | | |

RA09874

## Superior Broadcasting

| Ending Date: | 08/01/05 | | | |
|---|---|---|---|---|
| | Receivables Total | Receivables 30 Days | Receivables 60 Days | Receivables 90 + Days |
| Beginning Receivable Balance: | $71,230 | $56,304 | $1,268 | $0 |
| Total Ending Reccivable Balance: | $57,572 | | | |
| Collections: | $13,658 | | | |
| Expenditures: | $11,693 | | | |
| Cash On Hand: | $12,382 | | | |

| Ending Date: | 07/25/05 | | | |
|---|---|---|---|---|
| | Receivables Total | Receivables 30 Days | Receivables 60 Days | Receivables 90 + Days |
| Beginning Receivable Balance: | $25,590 | $10,210 | $1,268 | $0 |
| Total Ending Receivable Balance: | $11,478 | | | |
| Collections: | $14,112 | | | |
| Expenditures: | $14,823 | | | |
| Cash On Hand: | $10,417 | | | |

RA10793

## Superior Broadcasting

Ending Date:   08/07/05

| | Receivables Total | Receivables 30 Days | Receivables 60 Days | Receivables 90 + Days |
|---|---|---|---|---|
| Beginning Receivable Balance: | $57,572 | $44,151 | $1,268 | $0 |
| Total Ending Receivable Balance: | $45,419 | | | |
| Collections: | $12,153 | | | |
| Expenditures: | $13,257 | | | |
| Cash On Hand: | $11,278 | | | |

Ending Date:   08/01/05

| | Receivables Total | Receivables 30 Days | Receivables 60 Days | Receivables 90 + Days |
|---|---|---|---|---|
| Beginning Receivable Balance: | $71,230 | $56,304 | $1,268 | $0 |
| Total Ending Receivable Balance: | $57,572 | | | |
| Collections: | $13,658 | | | |
| Expenditures: | $11,693 | | | |
| Cash On Hand: | $12,382 | | | |

RA10794

1 2
pages

## Superior Broadcasting

**Ending Date:** 09/12/05

|  | Receivables Total | Receivables 30 Days | Receivables 60 Days | Receivables 90 + Days |
|---|---|---|---|---|
| Beginning Receivable Balance: | $55,482 | $41,527 | $1,268 | $0 |
| Total Ending Receivable Balance: | $ 42,795 | | | |
| Collections: | $ 12,687 | | | |
| Expenditures: | $ 22,128 | | | |
| Cash On Hand: | $ 1,081 | | | |

⟨1,441,000⟩

**Ending Date:** 09/07/05

|  | Receivables Total | Receivables 30 Days | Receivables 60 Days | Receivables 90 + Days |
|---|---|---|---|---|
| Beginning Receivable Balance: | $67,241 | $54,214 | $1,268 | $0 |
| Total Ending Receivable Balance: | $55,482 | | | |
| Collections: | $ 11,759 | | | |
| Expenditures: | $ 9,916 | | | |
| Cash On Hand: | $10,522 | | | |

1,843,000

RA05234

# Superior Broadcasting

**Ending Date:** 09/19/05

|  | Receivables Total | Receivables 30 Days | Receivables 60 Days | Receivables 90 + Days |
|---|---|---|---|---|
| Beginning Receivable Balance: | $42,795 | $31,272 | $1,268 | $0 |
| Total Ending Receivable Balance: | $ 32,540 | | | |
| Collections: | $ 10,255 | | | |
| Expenditures: | $  8,356 | | | |
| Cash On Hand: | $ 2,980 | | | |

**Ending Date:** 09/12/05

|  | Receivables Total | Receivables 30 Days | Receivables 60 Days | Receivables 90 + Days |
|---|---|---|---|---|
| Beginning Receivable Balance: | $55,482 | $41,527 | $1,268 | $0 |
| Total Ending Receivable Balance: | $ 42,795 | | | |
| Collections: | $ 12,687 | | | |
| Expenditures: | $ 22,128 | | | |
| Cash On Hand: | $ 1,081 | | | |

RA05235

## Superior Broadcasting

Ending Date: 09/26/05

| | Receivables Total | Receivables 30 Days | Receivables 60 Days | Receivables 90 + Days |
|---|---|---|---|---|
| Beginning Receivable Balance: | $74,368 | $64,091 | $1,018 | $0 |
| Total Ending Receivable Balance: | $ 65,109 | | | |
| Collections: | $ 9,259 | | | |
| Expenditures: | $ 9,765 | | | |
| Cash On Hand: | $ 1,891 | | | |

Ending Date: 09/26/05

| | Receivables Total | Receivables 30 Days | Receivables 60 Days | Receivables 90 + Days |
|---|---|---|---|---|
| Beginning Receivable Balance: | $32,540 | $22,760 | $1,018 | $0 |
| Total Ending Receivable Balance: | $ 23,868 | | | |
| Collections: | $ 8,672 | | | |
| Expenditures: | $ 9,255 | | | |
| Cash On Hand: | $ 2,397* | | | |

*Does not include $10 million invested ($6.3 from CR Allen III)

RA10792