1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
2

3    ------------------------------X
                                   :
4    ALLEN,                        :    09-CV-00668 (ADS)
                                   :
5                   Plaintiff,     :
                                   :    August 4, 2010
6              v.                  :    Central Islip, New York
                                   :
7    DEVINE, et al,                :
                                   :
8                   Defendants.    :
                                   :
9    ------------------------------X

10

11          TRANSCRIPT OF CIVIL CAUSE FOR STATUS HEARING
            BEFORE THE HONORABLE MICHAEL L. ORENSTEIN
12                UNITED STATES MAGISTRATE JUDGE

     APPEARANCES:
13

14   For the Plaintiff:        NATHANIEL READ, ESQ.
                               Cohen & Gresser, LLP
15                             800 Third Avenue, 21st Floor
                               New York, NY 10022
16
     For Arnold & Porter:      MICHAEL SCHISSEL, ESQ.
17                             Arnold & Porter, LLP
                               399 Park Avenue
18                             New York, NY 10022

     For Devine Defendants:    KEVIN J. O'CONNOR, ESQ.
19                             Peckar & Abramson, P.C.
                               41 Madison Ave, 20th Floor
20                             New York, NY 10010

21   For D&B Towers:           MEGAN MUOIO, ESQ.
                               Allyn & Fortuna, LLP
22                             200 Madison Avenue, 5th Floor
                               New York, NY 10016
23
     Court Transcriber:        MARY GRECO
24                             TypeWrite Word Processing Service
                               211 N. Milton Road
25                             Saratoga Springs, New York 12866


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service

2

1          THE CLERK:  Calling case number CV-09-668, Allen v.

2    Devine, et al.  Will the parties please state their appearances

3    for the record?

4          MR. READ:  Good morning.  Nathaniel Read from Cohen

5    and Gresser for the plaintiff.

6          MR. SCHISSEL:  Michael Schissel from Arnold and

7    Porter for nonparty Arnold and Porter.

8          MR. O'CONNOR:  Good morning, Your Honor.  Kevin

9    O'Connor; Peckar and Abramson on behalf of the Devine

10   defendants.

11         MS. MUOIO:  Megan Muoio from Allyn and Fortuna on

12   behalf of D&B Towers.

13         THE COURT:  Okay.  Please be seated.  Looks like

14   you've been abandoned.

15         MR. O'CONNOR:  Well, Your Honor, Mr. Curran had some

16   kind of hearing today.  I believe it might have been a trial.

17   He sends his regards.

18         THE COURT:  And you lost a couple of others along the

19   way.

20         MR. O'CONNOR:  We did.

21         THE COURT:  What would I ever do without those emails

22   from Mr. [inaudible]?

23         Well, why don't you folks bring me up to date?  I

24   gather since Arnold and Porter is represented here today, what

25   is happening with regard to the non-party subpoena of records

3

1    that quite frankly are in the possession and custody and

2    control of [inaudible]?

3            MR. READ:  Yes, Your Honor.  Would you prefer that I

4    stand?

5            THE COURT:  Well, I'd like you to turn your

6    microphone on.  That's the first thing.

7            MR. READ:  Well, there you go, Judge.  Can you hear

8    me?

9            THE COURT:  Hello there.

10           MR. READ:  All right.  Excuse me, Your Honor.

11           THE COURT:  Please remain seated though because as

12   your colleague will tell you, these microphones are terrible.

13           MR. READ:  Right.  So if I stand, it actually won't

14   work.

15           THE COURT:  Well, it will work but they won't catch

16   your voice.

17           MR. READ:  Well, Your Honor, pursuant to the Court's

18   order the privilege log for the hard copy documents was

19   prepared and provided to counsel for the parties on July 7th.

20   That's complete.  The documents that were not privileged, we

21   did review them just again just to make sure and those were

22   produced on July --

23           THE COURT:  No jokes in them; right?

24           MR. READ:  As far as I know, Judge, there were none

25   and I did review many of them myself.

4

1          THE COURT:  Counsel will explain that to you from a

2    certain production they got.

3          MR. READ:  I think Mr. Schissel is actually familiar

4    but --

5          MR. SCHISSEL:  I got the transcript from the last

6    proceeding.

7          THE COURT:  Okay.

8          MR. READ:  Those documents were produced July 22nd,

9    Your Honor, along with the supplemental privilege log,

10   additional documents --

11         THE COURT:  That supersedes the first privilege log?

12         MR. READ:  No, it's supplemental, Judge.

13         THE COURT:  It's an additional --

14         MR. READ:  There were documents within what had been

15   set aside for production that were in fact privileged.  Those

16   logs are quite substantial, Judge.  There are over 1,200

17   entries, an inch thick of paper, something like that.  We had a

18   conference call among the parties yesterday to discuss certain

19   issues that have come up with those privilege logs.  Defense

20   counsel has raised concerns about descriptions and authors and

21   we're working towards the resolution of those issues.  I don't

22   believe we need to raise those with the Court today.  Certainly

23   that's my understanding based on yesterday's call.  Counsel can

24   certainly correct me.

25         With regard to the electronic documents, the ESI,

5

1    that's in fact why Mr. Schissel is here.  Those documents

2    remain in the -- the status quo is as it was vis a vis the

3    letters before Your Honor.  If you recall, there is a letter

4    from Arnold and Porter dated June 10th, and then a letter to

5    Your Honor dated, from counsel for the Devine defendants dated

6    June 15th.  We did receive a call two weeks ago, I received a

7    call from counsel for the Devine defendants asking me what

8    plaintiff's position was.  And Your Honor, our position remains

9    that basically as articulated before the Court at the prior

10    conference.  The electronic documents, while certainly Your

11    Honor is correct, the documents that pertain to the

12    representation of our clients are technically within our

13    constructive custody or control.  Of course that's right,

14    Judge.  But they remain on the computer systems of Arnold and

15    Porter and Arnold and Porter has raised what, and certainly

16    counsel can speak for himself, but what appear to be good faith

17    objections to the breadth in particular, Your Honor, stating

18    that there are documents within that are responsive in the

19    sense of the search terms that have been proposed.  They appear

20    in those electronic documents but those documents may well

21    pertain to representation of other clients, clients that we

22    don't represent.  Obviously, Judge, we're not entitled to those

23    documents and they are not within our possession, custody and

24    control.

25          What we are willing to do and certainly be a part of

6

1  is some sort of negotiation, some sort of discussion to work to

2  identify a set of documents that are frankly presumptively non-

3  privileged because I think that's appropriate, and

4  presumptively or frankly maybe perhaps categorically, and I'll

5  certainly let counsel speak to it, not related to the

6  representation of other clients.  I don't think that would be

7  appropriate.  I'm sure Your Honor -- I don't want to presume

8  but I just don't think that will be appropriate, Judge.

9  So with regard to ESI that's where we stand.  The

10  documents remain on the system of Arnold and Porter.

11  THE COURT:  Any documents been provided from the

12  electronic documents?

13  MR. READ:  Well, Your Honor, it's my understanding,

14  frankly, that the primary lawyer involved, Mr. Robert Wesley,

15  had a practice at the time of printing out emails.  And in fact

16  many of the documents that were produced are printed out

17  versions of emails.  That's not ESI, Judge, of course.  But at

18  the time he printed them and he maintained them in a file.  So

19  as a practical matter I believe that a significant quantity of

20  the responsive documents have in fact already been produced

21  albeit in hard copy form.

22  THE COURT:  And I assume they have Bates numbers.

23  MR. READ:  Yes, sir, absolutely.

24  MR. O'CONNOR:  Well, Your Honor, I will say we are

25  working together on the privilege log for the hard copy.  I

7

1   believe within two weeks of this coming Friday our deadline

2   that we have self-imposed is to try to reach a resolution on a

3   corrected log.

4           With respect to the ESI, Judge, our position is

5   plainly stated in the June 15th letter.  We believe that this

6   material -- there's no distinction as we see it between the

7   client's files in hard copy and what's in the email.  It's

8   plain that we should be dealing with the plaintiff.  It's the

9   plaintiff's document.  Your Honor had said at the last hearing

10  --

11          THE COURT:  All right.  The problem is, and I think

12  it's pretty clear from the letters, Mr. O'Connor, that there

13  are documents, the electronic production or e-production, that

14  have nothing to do with Mr. Allen.  As pointed out in the

15  letter, even when the search term comes up using Allen we get

16  others which have absolutely nothing to do with this case.

17          MR. O'CONNOR:  Your Honor --

18          THE COURT:  Whether that's been a key, you've told me

19  that it's status quo from those letters, so I'm assuming that

20  nobody's told who's Allen and Allen 15, 40 other clients, 39 or

21  40, whatever it is.  See, I did read the letter.  That those

22  have been pulled or set aside or whatever.  And we're just

23  dealing with the documents given with C. Robert Allen, III or

24  whatever it is.

25          MR. READ:  Your Honor, it's my understanding, and

8

1  again, I'm certainly going to let Mr. Schissel speak I promise,

2  it's my understanding that Arnold and Porter's position is that

3  we require a detailed document by document review of over

4  180,000 documents, and it's my understanding that review has

5  not occurred.  But again --

6           THE COURT:  Well, the problem obviously is I can't

7  find, unless you both want to pay for it, somebody's who's

8  independent so that I don't have a breach of Arnold and

9  Porter's other clients' materials even from your eyes.  I

10 understand that.  I can't do much about trying to separate from

11 the computer systems Allen this and Allen that or something

12 from that standing unless the two of you arrive at an agreement

13 to agree to whatever production Arnold and Porter make based

14 upon the reputation, outstanding reputation of Arnold and

15 Porter with regard to their wearing a separate hat they being

16 the arbiter of that which belongs to you and that which belongs

17 to their other Allen clients or who's Allen Hamilton and

18 whatever [inaudible] for Arnold and Porter or whoever they

19 represent [inaudible].  I can't answer whether they were a

20 client or whether they were doing consulting work for Arnold

21 and Porter.  But that I think takes something, discussions that

22 counsel need to have.  Obviously you could have saved a lot of

23 time because I'm not the one who's going to review 108,000

24 documents in camera to determine whether it's their client or

25 not if there's a contest with regard to that, nor am I going to

9

1    be the one to go through the 108,000.  Somehow or other to me

2    that's too extensive a burden on Arnold and Porter to provide

3    the person hours to do that.

4              MR. O'CONNOR:  Your Honor --

5              THE COURT:  So unless we can refine our search terms

6    --

7              MR. O'CONNOR:  That's what I wanted to address.  I

8    mean we gave a list of search terms.  I don't think we're

9    hearing from a witness with personal knowledge giving Your

10   Honor a sworn statement that they ran the word, you know, C.

11   Robert Allen, they actually ran the search terms that we gave

12   them and came up with 190,000 pages of materials.  I don't

13   think I've heard that.  What I'm hearing is that we think it

14   might be a burden with respect to a subpoena that we served

15   almost six months ago.  So there has to be some working

16   together on this and we want to avoid a motion but we do regard

17   these materials as being within the possession, custody and

18   control of the plaintiff which is exactly --

19             THE COURT:  That may be that which belongs to them.

20   That's not the issue.  The problem is how to just get to those

21   documents which seem to be in the possession, custody and

22   control of plaintiff?  The issue is how to separate that

23   electronic in the electronics.  I'm not an electronic genius.

24   You know, you folks have much more experience with regards to

25   that than I do.  I'm an old man with regard to technology.  I'm

10

1   still working on my Commodore 64.

2           MR. READ:  Judge, may I just say something here?   In

3   the letter of June 15 from Mr. Curran he makes it clear that he

4   was going to work this out with plaintiff's counsel and he says

5   expressly Arnold and Porter need not play any role in this

6   process beyond making materials available to the plaintiff and

7   its principal --

8           THE COURT:  Well, that's fine but, you know,

9   plaintiff isn't entitled to some of those materials either if

10  they deal with other clients.  I recognize that.

11          MR. READ:  Right.  So there needs to be a discussion,

12  Your Honor's right, about the appropriate search terms and

13  counsel says there's no one here under oath with --

14          THE COURT:  I don't need somebody under oath.

15          MR. READ:  -- personal knowledge.  I think --

16          THE COURT:  I have counsel here.  Come on.

17          MR. READ:  Yeah.  The representations in our letter I

18  think are accurate.

19          THE COURT:  If I have to swear every counsel who

20  appears before me on conferences whether they can represent

21  non-parties or parties I mean that's taking these conferences

22  to an extent --

23          MR. O'CONNOR:  No, but Your Honor --

24          MR. READ:  What we did, Your Honor, is we took 57

25  keyword searches that they proposed --

11

1          THE COURT:  This is Heinz with 57 varieties?

2          MR. READ:  Yeah.  Well, it went from 190,000 to

3    118,000, so we're heading in the right direction but there

4    needs to be a further discussion.

5          THE COURT:  I know but I would like to get it speeded

6    up.  I mean --

7          MR. READ:  Right.  They need to have a discussion --

8          THE COURT:  Or otherwise you folks, very frankly, you

9    folks are going to be working with another Magistrate Judge

10   soon, very very soon if this doesn't get done.

11         MR. READ:  Well, we're standing ready to --

12         THE COURT:  I hate to have that happen because

13   somebody's going to have to then be brought up to speed on

14   something.  I'm sorry I interrupted.

15         MR. READ:  No, Your Honor.  So we stand ready to test

16   out additional search terms but there has to be a discussion

17   between the plaintiffs and the defendants and we'll do it.

18   We're just a stakeholder in terms of the documents, so we're

19   prepared to -- we want to cooperate.

20         THE COURT:  Well, the purpose of my asking the

21   question about whether documents had been pulled which are

22   clear to be involving C. Robert Allen, whether they've been

23   turned over to the plaintiff so we can possibly look at these

24   search terms.  For example, if they were put in those

25   electronic documents, the term was C. Robert or Robert C. or

12

1   Allen C. Robert or Robert C. Allen, I mean I don't -- to use

2   the term Allen, you know, I'm not disagreeing with you.  I

3   think I pretty much made that clear.  I mean I'm not interested

4   in who's Allen Hamilton unless they were involved somehow with

5   this case or whether the 39 or 40 other Allen clients were

6   involved.  I do need to say there is a need to distinguish.

7   How these other documents used the -- how they were pulled

8   because it had a C. Robert Allen, III in them somehow whether

9   it be in the content or whether it be in the to or from, you

10  know, what brought them out.  And in those documents were there

11  other search terms that could be used?  I mean what about Tower

12  Broadcasting.  I don't know if they're involved or not.  But

13  certainly the other clients probably would not have D&B Tower

14  or things of that nature.  You know?  Where those documents

15  could then be pulled from the electronics.  You shouldn't need

16  me to do that is what I'm saying other than the fact that

17  you've got to get together and do that.

18          So from the standpoint of documents which are clear

19  involving C. Robert Allen I think it's time for the plaintiff

20  to look at it to review them because first of all it's the

21  plaintiff's privilege, not Arnold and Porter's.  Second of all,

22  for the purposes of trying to come up with search terms.  Now,

23  the non-privileged documents should be turned over so that way

24  the defendant can get an idea of how to refine the search terms

25  and you can get to refine the search terms, and whatever

13

1    assistance Arnold and Porter can give with regard to the search

2    terms to provide that.  But I am not looking very frankly to

3    burden Arnold and Porter with a review of 108,000, or whatever

4    the number is, of electronic documents.  I think that's

5    totally, whether it's Arnold and Porter or whether it's

6    Sterling and Sterling or Skadden Arps I wouldn't do it.

7               MR. SCHISSEL:  I appreciate that, Your Honor.

8               THE COURT:  I hope I covered the large firms.  I

9    don't know what you want me to do.  I mean, you know, I'm

10   trying to --

11              MR. O'CONNOR:  Well, I think --

12              THE COURT:  I'd like to get these moved along.

13              MR. O'CONNOR:  I think what I've heard Your Honor say

14   is that we should be receiving things that are clearly within

15   the purview of discoverable materials.

16              THE COURT:  And for two reasons.  One, it would be

17   part of discovery and two, it would be helpful I think to look

18   to refining the search terms.

19              MR. O'CONNOR:  And we could work together to narrow

20   those terms that may be problematic for Arnold -- for the

21   plaintiff I should say.  We'll work --

22              THE COURT:  Well, it's problematic for Arnold and

23   Porter because they have other clients who are caught up in

24   these search terms.  To me that's very plausible.  You know,

25   we're dealing with Smith here.  We're not dealing with

14

1    Robersuski [Ph.] or something, you know.

2           MR. O'CONNOR:  I understand.  Your Honor, I think

3    that your direction has given us something to work together on

4    in going forward and we'll do the best we can.

5           THE COURT:  Well, I'm trying to get to some point.  I

6    mean obviously we have to [unintelligible] I think for an

7    extension of fact discovery in that same year, I think June

8    11th as a matter of fact I think that letter was.  I'd like to

9    hear from your co-defendant here whether they're just going to

10   try and get under the radar.

11          MS. MUOIO:  Well, Your Honor, we don't have a

12   position about the Arnold and Porter documents and we have

13   responded to discovery requests on us and I don't have any

14   issues to raise at this time.

15          THE COURT:  Well, you have no objection to what's

16   going on here or anything?

17          MS. MUOIO:  No, we don't.

18          THE COURT:  You have no position, nothing that you

19   wanted to add or suggest or --

20          MS. MUOIO:  No, Your Honor.  To make it easy for you,

21   no.

22          MR. READ:  Well, Your Honor, I take counsel

23   opposite's point and I certainly take the Court's point and I

24   think that if we started with a very limited amount of search

25   terms that were very focused, for example, C. Robert Allen,

15

1  Christopher Devine, that entire term, CRA as Mr. Allen is

2  sometimes referred to, I think that would be a more unique set

3  and we could generate a much more reasonable volume of data and

4  documents and that would not unduly burden Arnold and Porter

5  and not frankly unduly burden my firm with materials that we

6  have no right --

7          THE COURT:  Well, that's who should be burdened.

8          MR. READ:  Well, Judge --

9          THE COURT:  Whether it was your subpoena or not.  I

10  mean it's your possession and custody and control.

11          MR. READ:  If they relate to the representation,

12  Judge, but I would submit that not only do we not have a right

13  to review documents related to other representations but it

14  would be unduly burdensome if we had to sift through documents

15  regarding other clients, other matters; [unintelligible] Allen

16  for example which I understand to have no, you know,

17  relationship to this case.

18          THE COURT:  I'm assuming that everybody can agree --

19          MR. READ:  Absolutely.  So --

20          THE COURT:  -- that probably [unintelligible] Allen

21  had nothing to do with this case.

22          MR. READ:  Perhaps if we came on a list of five, ten,

23  a more narrow, more specific list of search terms we can make

24  an initial production.  Arnold and Porter could run those

25  searches and produce to us, we could review for privilege and

16

1   then go from there.  If additional rolling productions were

2   required as Your Honor has ordered in the past, we could

3   further that process.  We have no objection to that type of

4   process, Your Honor.

5           THE COURT:  So when can Arnold and Porter provide to

6   the plaintiff the documents which are clearly C. Robert Allen

7   or CRA or whatever counsel just indicated?

8           MR. O'CONNOR:  Or Devine.

9           MR. READ:  Well, I think the word Devine, again, it's

10  too ambiguous, Judge.  It would have to be Christopher Devine

11  or Chris Devine in quotes.  I mean to be candid with the Court

12  --

13          THE COURT:  I'm not limiting that.  I'm just trying

14  to get an idea from Mr. Schissel because I think --

15          MR. READ:  If we provided you with five or ten search

16  terms --

17          MR. SCHISSEL:  If we were provided with five or ten

18  search terms?  I mean I'm not the IT guy who's going to run it.

19  But I imagine it could be done within a couple of weeks or

20  less.  I don't know exactly how long that takes.

21          THE COURT:  Because I would like to see -- I don't

22  know how many documents we'll come up with out of the 108,000

23  with regard to that.  It's obvious the 108,000 contain a lot

24  more that has nothing to do with this case.  But then the

25  question becomes you've got to go through those documents

1  whether they're on disk or however that's provided.  I assume

2  you folks will all agree upon getting a system which will read

3  these documents if they're electronic.

4          MR. READ:  Yes, Your Honor.  I understand that

5  they've been --

6          THE COURT:  I'm not going to run into issues of

7  technology there.

8          MR. READ:  I don't believe so, Judge.  The Devine

9  defendants have produced their ESI with metadata and other

10  technological elements and my understanding is Arnold and

11  Porter has preserved that and we would be able to in turn make

12  a production that included the appropriate additional

13  information if you will.

14          THE COURT:  At the same time one of the items, and I

15  want to take care of this now before it becomes a problem

16  because I've now had two cases that I just want -- or one

17  anyway.  I've had two cases where in the to and from lines it

18  was addressed to people who turned out to be counsel and the

19  people who turned it over didn't recognize the name as being

20  their counsel.  I'm a little harsh when it comes to the

21  inadvertent productions.  So unless you folks have had some

22  agreement that you put into place with regard to inadvertent

23  production of privileged matter or other immune matter, when it

24  comes to not recognizing the names of attorneys, that's

25  happened to me twice.

18

1          MR. READ:  Well, frankly --

2          THE COURT:  That happens.  So I tell you now.  So if

3    there's something of a roster of identifications that you need

4    of these to and froms, whether it be your side or whether it be

5    your side on electronic productions, be aware of that.

6          MR. READ:  Yes, Your Honor.

7          THE COURT:  Or you can reach some agreement on

8    inadvertent production.

9          MR. READ:  Well, I don't believe we were able to

10   reach an agreement on that in particular.  I don't have Your

11   Honor's --

12         THE COURT:  Well then I'll just go through the good

13   old Lois Sportswear and my own evaluation that I did in

14   Atronic.

15         MR. READ:  But Your Honor, frankly what Your Honor

16   just described happened in this case with regard to the Devine

17   defendants' production and we have not had any practice on

18   that, but that did happen, Judge.  But I can tell you we have a

19   long list and we provided --

20         THE COURT:  I prefer that there be an agreement so

21   you don't have to reach all of that because as I say, my

22   determination is at least one which was written in writing.

23   The Atronic case was harsh but it went right to the heart of

24   the lawsuit.  It was a contract where one side was claiming

25   that it was an order of 40,000 and the other side said no, it's

19

1  5,000.  The emails reflected what it was.  Then unfortunately

2  those emails were privileged emails but they were turned over

3  because they didn't recognize the name as being their own

4  counsel when they turned it over.  I was not too -- I liken it

5  to sort of the SEC v. Pasano case where they called -- this was

6  the SEC that turned over documents where I believe they were

7  called and said, you know, we have these four documents.  You

8  think we ought to turn them over?  Oh yeah, yeah, you know,

9  sure.  Turned out they were, I think they were privileged, they

10  were clearly privileged documents and the Southern District

11  didn't take kindly to the claim of inadvertent production.

12          MR. READ:  That's understood, Your Honor, and we have

13  worked diligently to avoid that.

14          THE COURT:  Well, I would suggest you --

15          MR. READ:  And we will continue to do so.

16          THE COURT:  -- the two of you go down the elevator

17  today and you talk a look at that.  What may happen is that

18  both sides might get affected by that.  I tell you about that

19  now before I have to deal with those issues.  It happens.

20          So if you can get the documents in some -- whether it

21  be on disk or whatever form you have for them to clearly

22  respond to the search terms --

23          MR. SCHISSEL:  Yeah.  Well, I think what needs to

24  happen is they'll agree on a set of search terms --

25          MR. READ:  Right.

20

1              MR. SCHISSEL:  -- they'll give them to us, we'll run

2    them and we'll see what universe we come up with and then we'll

3    have a discussion.  Maybe it will need to be refined further.

4    That's what needs to happen.

5              THE COURT:  My feeling is if you do the refined

6    search terms it's going to further knock it down --

7              MR. SCHISSEL:  Sure.

8              THE COURT:  -- to a great extent.  It's still

9    plaintiff's privilege.  They've got to review it for privilege.

10             MR. SCHISSEL:  Yeah.

11             THE COURT:  So if you can get your end done within

12   the two weeks --

13             MR. SCHISSEL:  Well, I would think that in two weeks

14   is when they actually give us the search terms they want us to

15   run, yes.

16             THE COURT:  You folks are going to take two more

17   weeks for that?

18             MR. READ:  Judge, we'll get on it and I'm hopeful,

19   especially if the Devine defendants will agree to a very narrow

20   set.  It has to be a narrow set otherwise it's just not going

21   to be helpful, Judge.

22             THE COURT:  Let me be very clear.  I am retiring as

23   of the close of business September 30th.

24             MR. READ:  I'm sorry to hear that, Your Honor.

25             THE COURT:  I do not want to leave an issue of this

21

1    nature, at least with regard to the search terms for this

2    production for someone else to start fresh with.  I'd like to

3    get that done.

4              MR. READ:  Understood, Judge.

5              THE COURT:  I'd like to get the search terms done.  I

6    want the production done at least with the privilege log done

7    with regard to those items and to determine whether there's

8    anything further that needs to be done with that before I leave

9    so I'm not saddling somebody with something.

10             MR. READ:  I don't think that timeline is at all a

11   difficult one to meet especially if we can agree, as counsel

12   for Arnold and Porter said, on a narrow list of search terms

13   for an initial production perhaps without prejudice to a right

14   to seek additional rolling productions.  If we can do that, and

15   again if the search terms are in the range of five or ten and

16   they're very specific to the parties and people involved, I

17   think we can do that relatively quickly, Judge.  I would

18   absolutely endeavor to do it by the end of September.

19             MR. O'CONNOR:  The key operative word there is

20   without prejudice.  I'll talk to the people I work with on

21   this.  We'll try and get a list of search terms of up to ten

22   and we'll get going on this, Judge.  I will say that good luck

23   with your retirement.  I hope I see you before that.  We've

24   appreciated having you on this case.

25             THE COURT:  Now, was the problem the word Allen or

1   the name Allen that it came up with or were there other

2   problems that --

3           MR. SCHISSEL:  Allen was just one example of the 57.

4   There were others.

5           THE COURT:  Okay.  That's what I'm asking.

6           MR. SCHISSEL:  Yes.

7           THE COURT:  Whether there was other --

8           MR. O'CONNOR:  But Bazile [Ph.] or Devine or Superior

9   Broadcasting in my view --

10          THE COURT:  What I'm afraid of is if we start with

11  the Davis name, the name Davis, Davis is like Smith.  I mean I

12  would assume Arnold and Porter had other clients who had the

13  name Davis at some point.

14          MR. READ:  That's why I think, Judge --

15          THE COURT:  Or letters that went out to Davis Polk or

16  something.

17          MR. READ:  Right.  That's what I mean, Your Honor.

18  We'll have to agree to Richard Davis or something less

19  ambiguous.

20          THE COURT:  I mean I can't answer this.  You guys

21  have lived with this case for forever.  This goes back to when?

22          MR. READ:  The conduct or the case being filed?

23          THE COURT:  How many years back with the Arnold and

24  Porter files with the records with regards to Allen and Davis,

25  Devine?

23

1          MR. READ:  The representation of the Allen family

2  goes back quite a ways.  The representation that's really at

3  issue started in late 2005.

4          THE COURT:  Okay.  Anything else that we need to deal

5  with today?

6          MR. READ:  Well Your Honor --

7          THE COURT:  What's happening with the rolling

8  production from Chicago?

9          MR. READ:  Just to speak to that briefly, Judge --

10          THE COURT:  Or Salt Lake City or Cincinnati?

11          MR. READ:  We've received from cover, at least a

12  cover letter from Chicago, I don't know where the documents

13  [unintelligible].  Just yesterday we received an additional

14  approximately 95,000 pages of ESI with a representation that

15  additional ESI would be forthcoming in 21 days.

16          That brings me, Judge, to something you touched on

17  earlier which is the pending joint motion or joint request to

18  extend the discovery schedule to February and May.

19          THE COURT:  I just want to get the right year though.

20          MR. READ:  Yes, Judge.

21          THE COURT:  I mean your colleague's letter had

22  discovery, the extension expiring before it got extended.

23          MR. READ:  It was a quite unfortunate typo, Judge.

24          THE COURT:  I'm just giving you the needle.

25          MR. READ:  Yeah.  Actually, to give credit where it's

24

1   due I think it was Mr. O'Connor who caught it unfortunately too

2   late and --

3            MR. O'CONNOR:  Law review came in handy for

4   something.

5            MR. READ:  And so we regret that error.  But of

6   course we were able to correct it and we appreciate the Court's

7   courtesy.  So if Your Honor -- I don't know if Your Honor wants

8   to put that date down.  If you think that perhaps we need more

9   time I certainly -- our position remains that we are hopeful

10  and believe in good faith we can get it done by February 15th

11  of 2011, Judge, and we would hope that Your Honor could so

12  order that and of course stand ready to discuss anything else.

13           THE COURT:  All right.  That's fact discovery?

14           MR. READ:  Yes, Judge.

15           THE COURT:  I just want to make it clear.

16           MR. O'CONNOR:  I just wanted to add that since this

17  letter was written we've received the decision by Judge Spatt

18  that basically is going to result in discovery being taken in

19  two forums.  It's probably going to add to the complexity of

20  the discovery.  February 15th may be a little aggressive.  I

21  just throw that out --

22           THE COURT:  Well, you'll have to take that up with

23  whoever at that point succeeds me.  I will put in the fact

24  discovery as February 15th.  I'm not going to deal with it one

25  way or the other and make determinations for another.  I can

25

1   only tell you that other than some other cases Mr. Schissel has

2   been working on that's before Judge Spatt which has been how

3   old now?

4           MR. SCHISSEL:  I think it's 12 years old.

5           THE COURT:  Well, that was a multi-district

6   litigation case when it started.

7           MR. SCHISSEL:  Yeah.  It was on ice for a long time.

8           THE COURT:  Hm?

9           MR. SCHISSEL:  It was on ice for a long time.

10          THE COURT:  Well, that was sort of an exchange for I

11  believe the flight that went down off of Long Island.

12          MR. SCHISSEL:  Oh, yeah.  You mean the TWA flight.

13          THE COURT:  The multi-district litigation panel

14  removed that MDL case from the Eastern District and gave it to

15  the Southern District on the grounds that all the witnesses

16  were from Long Island, and therefore, it belonged in the

17  Southern District.  So in order to take care of the hurt

18  feelings they decided to send that other case.

19          MR. SCHISSEL:  Yeah, right.  I don't know who got the

20  better deal.

21          THE COURT:  You can't make these things up, but

22  that's my understanding of what happened.

23                      [Pause in proceedings.]

24          THE COURT:  The point that I was making is that it's

25  a Judge Spatt case and that he generally is up to date on his

26

1  cases.  The one that I was referring to, that case has had an

2  Appellate history and I believe there's another appeal that's

3  been filed.  Is that true?

4        MR. SCHISSEL:  It's what?

5        THE COURT:  I think there's another appeal that was

6  filed.

7        MR. SCHISSEL:  Oh, yeah.  We petitioned Judge Spatt

8  to grant the class certification, so we're back up in the Court

9  of Appeals.

10        THE COURT:  I mean that case has sort of --

11        MR. SCHISSEL:  It's a procedural morass that case.

12  And even after Judge Spatt's done it gets sent to the Southern

13  District for trial.  So it's an MDL with one case now.

14        THE COURT:  Well actually I mean it may be the one

15  left at this point.

16        MR. SCHISSEL:  Right.

17        THE COURT:  There was a conglomeration that sort of

18  wound up -- some went to arbitration so they fell by the

19  wayside.  There were still others that had -- I can't figure

20  out whatever happened to the group from Texas?

21        MR. SCHISSEL:  The group from Texas?

22        THE COURT:  Yes.  There was an attorney who showed up

23  one day from Texas and when Judge [inaudible] was trying to

24  settle the cases he didn't know about that.  I mean it was all

25  sorts of things that happened.

27

 1              MR. SCHISSEL:  I don't remember, I don't remember.

 2              THE COURT:  Oh, yes.  I mean I couldn't believe it.

 3    There was supposed to be a conference being held in the

 4    courthouse and this attorney shows up who's representing some

 5    of the parties.  I don't even remember which side.  I guess it

 6    was some of the plaintiffs.

 7              MR. SCHISSEL:  Oh no, he was a witness.

 8              THE COURT:  He showed up from Texas and nobody had

 9    told Judge [inaudible] there were other cases or that it was an

10    MDL and he thought he had -- I don't know.

11              MR. SCHISSEL:  Well [inaudible] the Second Circuit

12    said no.

13              THE COURT:  Yes, well hello.

14              MR. SCHISSEL:  Yeah, that's something else.

15              THE COURT:  I'm glad I'm finished with that one.

16              MR. SCHISSEL:  What's that?

17              THE COURT:  I'm finished with that one.

18              MR. SCHISSEL:  Yeah, you won't miss that one.

19              THE COURT:  No, I won't miss that one.  As you said

20    almost 11 years for that.

21              MR. SCHISSEL:  Right.

22              THE COURT:  I thought it was with the IBM case and

23    back to Judge Edelstein again.

24              MR. SCHISSEL:  That's what I was thinking.  So do you

25    have plans for retirement?

1              THE COURT:  Relax awhile.  Learn how not to set an

2  alarm clock.

3              MR. SCHISSEL:  Yeah.

4              THE COURT:  Eventually what I might try working with

5  is some adult education dealing with the Bill of Rights.  We'll

6  see.

7              MR. SCHISSEL:  Yeah.

8              THE CLERK:  [Inaudible].

9              THE COURT:  Yes, whatever.  I guess the photostat

10 machine is on its coffee break again or the phones are going to

11 start ringing again.

12             MR. READ:  Oh, will we see you before you --

13             THE COURT:  Yes.

14             MR. READ:  Okay.

15             THE COURT:  I put it down for -- because I want a

16 report back what's happening on this and --

17             MR. READ:  Yes, sir.

18             THE COURT:  -- what we discussed today.  September

19 28th at 11:00.  It's on the conference sheet.  If you resolve

20 everything with these folks --

21                          *  *  *  *  *  *

22

23

24

25

29

1      I certify that the foregoing is a court transcript from an

2   electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5   _____

6                            Mary Greco

7   Dated:  August 17, 2010